**McCARTHY WELL COMPANY, INC., Appellant,**

v.

**ST. PETER CREAMERY, INC., Respondent.**

No. C6–85–1740.

Court of Appeals of Minnesota.

June 10, 1986.

Review Granted Aug. 20, 1986.

Michael A. Nekich, Robert P. Thavis, Leonard, Street & Deinard, Minneapolis, for appellant.

W.M. Gustafson, Michael K. Riley, MacKenzie, Gustafson & Lucas, St. Peter, for respondent.

Heard, considered and decided by PARKER, P.J. and LANSING and CRIPPEN, JJ.

## OPINION

LANSING, Judge.

St. Peter Creamery, Inc., hired McCarthy Well Co., Inc., to restore the flow in an artesian well that supplied water to the Creamery. McCarthy Well took measures to increase the flow, including replacement of the well's pump. The Creamery made partial payment, and McCarthy Well sued to collect the balance. The Creamery counterclaimed, alleging negligence in the installation and removal of the pump. The jury found in favor of the Creamery, and McCarthy Well appeals from the judgment and an order denying a new trial. We affirm.

## FACTS

McCarthy Well services and repairs large industrial and municipal wells and well pumps. St. Peter Creamery processes liquid milk products into powder. The Creamery's drying process uses large amounts of water to evaporate and cool the milk products. Until 1979 the Creamery obtained most of its water from an artesian well with a centrifugal pump located within the plant. At that time the Creamery doubled its processing capabilities, which increased its need for water. The artesian well's flow had decreased, and the Creamery's water supply had to be supplemented with city water.

A representative of McCarthy Well made a free inspection of the Creamery's well in April 1979. In June the Creamery wrote McCarthy Well inquiring whether they could restore the artesian well to its original capacity. After discussions between McCarthy Well's sales representative and the Creamery's manager, McCarthy Well mailed the Creamery a form "Acknowledg-

ment of Order" and accompanying rate schedule. The reverse side of the acknowledgment contained provisions in extremely fine print broadly limiting liability.

On August 28 McCarthy Well began testing the well. After removing the pump and the copper liner, it "airlifted" sand out of the bottom and "televised" the well. The airlifting produced little sand, so McCarthy Well exploded a 20–pound charge of dynamite at the bottom of the well, which increased the flow of water. McCarthy Well then recommended and installed a new turbine pump. The installation was completed on October 24, 1979.

In November 1979 McCarthy Well billed the Creamery for $34,573.27. The Creamery made only partial payment. In March 1980, McCarthy Well sued to recover the balance. A short time later the pump shaft broke, and McCarthy Well repaired it. The Creamery then asserted its counterclaim for negligence and for misrepresentation of the amount of time the job would take.

The pump's shaft broke again in April 1980, and McCarthy Well repaired it once more. When it broke again in August 1980, the Creamery hired the St. Peter Well Co. to install a new pump. The second pump lasted until January 1981, and televising performed at that time revealed a hole in the well casing. The Creamery ultimately dug a new well and installed a new pump in the summer of 1981.

The Creamery claimed the lack of water during certain periods of time damaged its product, and sought the difference between the price it received for the damaged product and the price the product would have sold for had it not been damaged. The jury awarded McCarthy Well $29,573, the amount McCarthy Well claimed was owed plus interest. The jury also found the Creamery sustained $190,000 in damages as a result of McCarthy Well's "negligence" in performing its work and apportioned 75 percent of the fault to McCarthy Well and 25 percent to the Creamery. The

trial court ordered judgment in the amount of $113,926 and denied McCarthy Well's motion for a new trial.

### ISSUES

1. Does the *Superwood* doctrine preclude an action for economic loss arising entirely from the negligent performance of services?

2. Did the trial court abuse its discretion in excluding evidence of the terms and conditions of the parties' contract?

3. Did the Creamery's late disclosure of specific claimed acts of negligence and of an expert witness it intended to call at trial prejudice McCarthy Well?

4. Is the record sufficient to review McCarthy Well's claim that the trial court erred in questioning the jurors about their possible affiliation with McCarthy Well's insurer?

5. Did the trial court err in instructing the jury on damages, refusing to find the special verdict inconsistent, or in refusing to reduce the damage award?

6. Is the evidence sufficient to support the verdict?

### ANALYSIS

#### I

■ McCarthy Well argues that *Superwood v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981), prevents the Creamery from recovering economic losses under a negligence theory. In *Waldor Pump and Equipment Company v. Orr-Schelen-Mayeron and Associates*, 386 N.W.2d 375 (Minn.Ct.App., 1986), we held that *Superwood* did not limit the legal remedies of individuals economically injured by the negligent performance of professional services. Our holding in *Waldor Pump* applies equally to this case because the damages claimed by the Creamery result not from failure of a product, but from negligent performance of services.[1] *See also Valley*

1. While the Creamery's counterclaim essentially alleged "negligent breach" of contract, McCar-

thy Well did not argue at trial that the counterclaim was in contract rather than in negligence;

*Farmers Elevator v. Lindsay Brothers Co.*, 380 N.W.2d 874 (Minn.Ct.App.1986), *pet. for rev. granted,* (Minn. April 11, 1986).

## II

The trial court ruled inadmissible the reverse side of the Acknowledgment of Order form, which contained an exculpatory clause stating McCarthy Well would "not be liable for * * * damages or liability of any nature whatsoever arising or growing out of contractor's work * * *." (See Appendix A). The court excluded the reverse side of the form because it was illegible.

■ Although not expressly stated as such, the trial court's ruling was apparently based on a theory of unconscionability. *See* Restatement of the Law (Second) *Contracts,* § 208 (1981). While exculpatory clauses between private parties are not per se unenforceable and their validity has been recognized in certain circumstances, *Solidification, Inc. v. Minter,* 305 N.W.2d 871, 873 (Minn.1981), the manner in which these one-sided provisions appear may constitute unfair surprise or unconscionable oppression, even when both parties are businesses. *See Architectural Cabinets, Inc. v. Gaster,* 291 A.2d 298, 301 (Del.Super.1971) (confession of judgment clause written in fine print held unconscionable); *Weaver v. American Oil Co.,* 257 Ind. 458, 461, 276 N.E.2d 144, 147 (1971) (indemnification clause in lease unconscionable because, in part, "the clause was in fine print and contained no title heading which would have identified it as an indemnity clause").

■ In this case the provisions limiting McCarthy Well's liability are written in miniscule print; the form itself contains over four thousand words. No title headings or bold print alerted the Creamery to the release from liability. Rather, these terms appear on the middle of the form,

not set apart from the form's other provisions. Under these circumstances, the trial court did not err in excluding the terms on the back of the acknowledgment form.

■ Furthermore, exculpatory clauses are invalid if they purport to exonerate a party from willful or wanton recklessness or intentional torts. *Schlobohm v. Spa Petite,* 326 N.W.2d 920, 923 (Minn.1982). Exculpatory clauses will be strictly construed against the benefited party. *Solidification, Inc. v. Minter,* 305 N.W.2d 871, 873 (Minn.1981). Here, the exculpatory clause was not strictly limited to liability for acts of negligence, but provided exculpation from "any * * * damage or liability of any nature whatsoever arising or growing out of [McCarthy Well's] work hereunder." The wording of this clause apparently covers damages arising from even recklessness or intentional conduct of McCarthy Well. Strictly construed, this clause is not limited to the permissible exoneration from liability for negligence and hence is invalid. *See Schlobohm,* 326 N.W.2d at 923.

## III

McCarthy Well next contends the trial court abused its discretion in permitting testimony about claimed acts of negligence identified in the Creamery's amended answers to interrogatories dated six days before and received five days before trial. McCarthy Well also objects to the trial court's decision to allow St. Peter Well Co.'s Joel Schaffer to testify as an expert witness. Schaffer had previously been deposed as a fact witness; notice that he would testify as an expert was received the same day as the amended answers. The trial court excluded the testimony of two other experts who had not been previously deposed and were identified as expert witnesses a week before trial.

nor did McCarthy Well object to apportionment of fault. Submission of the negligence claim to the jury rendered it the law of the case. *See Lesmeister v. Dilly,* 330 N.W.2d 95, 102 (Minn. 1983). To that extent, this is a "negligence" case, and *Superwood* does not preclude the re-

covery of these "economic losses." If the Creamery's counterclaim had been submitted on a breach of contract theory, consequential damages could have been recovered if contemplated by the parties as a probable result of a breach. *See id.* at 103.

McCarthy Well argues that it lacked sufficient notice of the claims the Creamery intended to argue at trial. In fact, of the five claims of negligence specified in the Creamery's amended answers, two were identified in 1980 in the Creamery's original answers to McCarthy Well's interrogatories. The other three claims (failure to plumb the well before installing the pump, failure to inspect the casing after blasting, and excessive use of dynamite) were alleged, in general terms, in the Creamery's counterclaim, which stated that McCarthy Well negligently installed the new pump and removed the old one.

In depositions of McCarthy Well's foreman and superintendent, the Creamery's lawyer extensively inquired about the use of dynamite. The foreman and Joel Schaffer were similarly questioned about the failure to plumb the well and the implications of that failure. For these reasons, we conclude that the disclosure of specific allegations of negligence five days before trial did not render the Creamery's original answers inaccurate, untrue or incomplete and consequently did not inject an element of surprise into the trial. *See Gebhard v. Niedzwiecki*, 265 Minn. 471, 477, 122 N.W.2d 110, 114 (1963).

 The decision to permit the use of expert testimony, even on short notice, is within the trial court's discretion. *Cornfeldt v. Tongen*, 262 N.W.2d 684, 697 (Minn.1977). Exclusion is justified only when prejudice would result. *Dennie v. Metropolitan Medical Center*, 387 N.W.2d 401 (Minn.1986). Here, Schaffer had been deposed as a fact witness and was questioned about the hole in the casing and the need to plumb the well. He stated his opinion that McCarthy Well initially should have plumbed the well. Thus, McCarthy Well was put on notice of the "well plumbing" issue and was not prejudiced by the trial court's decision to allow Schaffer's opinion testimony as an expert.

## IV

 Rule 31, Part I, of the Code of Rules for the District Courts permits the trial court to examine jurors about their contacts with an insurer not a party to the action if the insurer is "interested" in the defense or outcome of the action. *See also Hardware Mutual Insurance Co. v. Danberry*, 234 Minn. 391, 401–02, 48 N.W.2d 567, 573 (1951). The propriety and necessity of examining jurors about their potential affiliations with an insurer rests in the discretion of the trial court. *Viou v. Brooks-Scanlon Lumber Co.*, 99 Minn. 97, 107, 108 N.W. 891, 895 (1906).

The pretrial conference in which the trial court obtained the name of McCarthy Well's insurer and discussed the insurer's interest in the action was not transcribed. McCarthy Well moved to correct the omission in the record and was directed by this court to obtain a statement of proceedings under Minn.R.Civ.App.P. 110.03. The trial court judge has since moved to California, and McCarthy Well did not attempt to submit a proposed statement of proceedings to him. The parties submitted conflicting affidavits on the pretrial conference proceedings.

 When part of a transcript which forms the basis for an appeal cannot be obtained, we must determine whether the question on appeal can be adequately presented without the missing portion of the transcript. *Soukup v. City of Sleepy Eye*, 281 Minn. 144, 146, 161 N.W.2d 36, 37 (1968). Here, the absence of the transcript prevents us from determining what facts the trial court possessed that led him to examine the jurors about McCarthy Well's insurer.[2] The parties disagree whether the court was told that coverage was in question or that no claim had been made at all. When no approved statement of proceedings has been obtained, for whatever reason, this court cannot attempt to harmonize

---

**2.** The missing transcript is not required to preserve McCarthy Well's challenge to the voir dire because McCarthy Well's motion for a mistrial immediately after the allegedly improper examination of the jurors is sufficient to preserve the point for appeal. *Rosenthal v. Kolars,* 304 Minn. 378, 380–81, 231 N.W.2d 285, 287 (1975).

factual disputes that form the basis of a claim on appeal. *Soukup; see also* 3 Magnuson, Herr and Haydock, *Minnesota Practice* § 110.11, at 291 (West 1985). In an area committed to the discretion of the trial court, this record is insufficient to find an abuse of that discretion.

## V

■ A. McCarthy Well claims that the trial court erred in failing to instruct the jury on the duty to mitigate damages.[3] It did, however, instruct the jury on comparative negligence. Therefore, the court's instructions did take mitigation into account and were not erroneous.

■ B. The verdict is not inconsistent. The jury found for McCarthy Well on its collection claim and awarded it the full amount requested. McCarthy Well argues this aspect of the verdict is inconsistent with the finding that it was negligent. The trial court instructed the jury to separate the negligence issue from the collection issue. The jury, therefore, did not consider either party's negligence when determining the reasonable value of McCarthy Well's services.

■ C. The award of damages was not excessive or contrary to the evidence. The Creamery claimed damages of $216,499; the jury found damages of $190,000.

McCarthy Well argues that to arrive at the $190,000 figure, the jury necessarily and erroneously took into account losses sustained by the Creamery before the pump broke for the first time. The verdict form did not require the jury to explain how it arrived at the damages figure. The jury could have considered other damages, such as repair costs, in reaching its verdict. Those costs, rather than passion or prejudice, may be the basis for part of the damage award. *See Kinikin v. Heupel*, 305 N.W.2d 589, 596 (Minn.1981).

## VI

■ McCarthy Well argues that the jury's verdict was not supported by the evidence. There was conflicting testimony as to whether the casing could have been damaged by the dynamite, and as to whether McCarthy Well's method of plumbing the well was acceptable practice. The jury also heard McCarthy Well's witnesses state that the Creamery's practice of grounding the plant's electricity through the well caused the holes in the casing. We cannot say the verdict was palpably contrary to the evidence. *See Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn.1984).

## DECISION

Affirmed.

3. McCarthy Well also argues that the trial court abused its discretion in sustaining the Creamery's relevancy objection during McCarthy Well's cross-examination of a Creamery official. McCarthy Well claims that it made an offer of proof relating to mitigation of damages; that offer of proof was not transcribed. The Creamery's counsel does not recall the substance of that offer of proof. We cannot harmonize conflicting accounts of a bench conference where no approved statement of proceedings exists. *See* Part IV, *supra.*

# APPENDIX A

THE WELL COMPANY STANDARD GENERAL TERMS AND CONDITIONS
(Revised Edition 1964)

(McCarthy Well Company is hereinafter sometimes referred to as "Contractor", "he", "it", and their possessive.)

Except as modified by any provision appearing on the face hereof or appearing in the exhibits referred to or attached hereto, the following terms and conditions shall apply:

1. The Contractor shall: (a) If he is to perform labor: (1) provide supervision, and use such of his skill and efforts as are, in his sole opinion, necessary to accomplish the work undertaken; (2) carry, on his own men, Workmen's Compensation and Public Liability insurance; (3) supply experienced and competent labor. If he is to furnish equipment, provide suitable and adequate equipment for the performance of the work. (4) If he is to furnish materials, Contractor will order such materials, equipment and tools as in his judgment are required for the performance of the work hereunder and all of same will be invoiced to Owner at Contractor's regular selling or rental price, as the case may be, at time of shipment, plus (1) freight from point of origin to point of delivery at actual cost, and (2) taxes on sale, delivery or use thereof. (d) Commence operations as promptly as possible and place orders for material required and diligently prosecute the work until completed; (e) Upon completion of the work, remove his own equipment and material except as qualified in "2(d)".

Should the Owner object to the competence, or other behavior, of any of the men on the job, or should the Owner make any claim that the equipment on the job is inadequate and unsuitable, then the Owner shall immediately notify the Contractor of his complaints, in writing, specifying particularly his objections to the men, or men, or equipment, and the Contractor will then, upon receipt of such notification, examine into the Owner's complaints and the reasons assigned therefor and, if the Contractor deems the said complaints to be reasonable, he will then substitute for the man, or men, or equipment complained of. Until receipt of any such notice in writing, the Owner shall not be liable for the hourly charges. In the event that any equipment is substituted as a result of the foregoing notice by the Owner, then the Owner will be liable for the cost of moving the substituted equipment back to Contractor's warehouse and for the cost of moving the substitute equipment to the job, the same to be calculated according to the Contractor's then prevailing rates for such movement of equipment.

2. The Owner agrees to:

(a) Pay the amounts indicated on the face hereof, on exhibits referred to or attached, and those amounts specified herein.

(b) Select the location of the well, test hole or bore work sites, and take full responsibility for selection of the same; any statements made by the Contractor are suggestions only and shall not be construed as representations as to where the hole should be drilled

(c) Promptly provide, without charge to the Contractor: (1) adequate space for ingress and egress including adequate and suitable access roads and for the setting and operating of the Contractor's equipment and materials; (2) whatever water or other liquids are to be furnished or supplied by Owner, at or near the immediate well or work site; and (3) whatever power, wiring, hook-up, pits, foundations, pump house, piping and lights etc. may be required at the immediate well or work site.

(d) Make arrangements for the disposal of debris, water and waste produced as a result of work performed by the Contractor hereunder.

(e) Obtain all the necessary authority, rights and permits to drill, for the work to be performed hereunder (including but without limiting the same, such rights and permits for the location selected, passage of emergency resolutions required for the work, record the order, certificates as to availability of funds to pay for amounts required hereunder, etc.). Any defects in or failure to obtain any such rights, permits, etc. shall not prejudice the Contractor's rights to receive payment for the work done.

(f) Pay for any additional consulting engineering service which Owner may employ or that may be required

(g) Pay any amounts that are necessary or ordered, in accordance with the terms and conditions applicable to the work thereof, that are destroyed in the performance of the work hereunder originally ordered.

(h) Reimburse Contractor for the reasonable value of any of the Contractor's in-hole equipment and material that is lost or destroyed in the performance of the work hereunder

(i) Pay the Contractor's standard charge for men and equipment for any and all waiting or shut-down time for men and equipment, or for equipment only as the case may be, due to:

(I) Bad weather; (II) Awaiting arrival of repair parts, materials, or equipment; (III) Awaiting decisions of the Owners, (iv) and the like

The maximum charges for waiting time shall be limited to 8 hours per day, six days per week for the men and equipment on the job site, plus living expenses for such men.

Should the men be taken off the job during a shut-down period, then the Owner shall be liable only for (1) the time consumed at the hourly rate and (2) living expenses and (3) the mileage charge for each man in going from the job site to the Contractor's warehouse and service station and return and also (4) the stand-by rates for equipment

Stand-by rates for equipment only shall be 50% of the applicable standard hourly rates for men and equipment.

(j) Pay any State tax imposed upon the Contractor in connection with the work performed hereunder, excluding, however, any income taxes.

(k) Pay any premium for bonds required of Contractor.

(l) Save the Contractor harmless in the event of accidental damage to crops, buildings, trees, fences, walks, or any other property upon or adjacent to such site.

3. With respect to work, or any portion thereof, that is to be performed on an hourly basis, the following special provisions shall be additionally applicable:

against liability, Contractor shall not be liable for, and Owner agrees to indemnify Contractor against and hold Contractor harmless as to:

1. Any damage, directly or indirectly, resulting from injury to any existing underground installation at the site of the work or adjacent thereto or in the vicinity thereof, including, but not limited to, sewers, water and gas mains, conduits, overhead power lines, foundations of overhead towers and tanks, etc.

2. Any damage whatsoever, including loss, theft, or vandalism, that may be caused to any pumphouse, well, well, materials, pump or parts thereof, water system or water supply, etc. or to any of the Owner's equipment in the Contractor's care, custody or control.

3. Any infringement on water rights of Owner or others caused by operation of water well or wells installed by Contractor.

4. Any damage resulting from (1) the breaking or the losing of tools in the well, (ii) dynamiting, (iii) shooting, (iv) casing collapse, (v) the failure to repair said well or pump, or (vi) any like cause.

5. Any damage or loss suffered by Contractor to the Contractor's work in progress, equipment or other material at the job site resulting from theft, vandalism, and the like.

6. Any other damage or liability of any nature whatsoever arising or growing out of Contractor's work hereunder.

7. Any subsurface damage or injury to the well, or, surface damage arising out of such subsurface damage or injury to the well, irrespective of the cause, that may result from Contractor's performing or attempting to perform the work hereunder, and the Owner shall absolve and hold Contractor harmless from all loss, costs, damages and expenses, incurred by Owner or by any third party, irrespective of cost, resulting from any subsurface damage or injury to the well or resulting from surface damage arising out of such subsurface damage or injury to the well

(b) Contractor shall not be liable for any failure or delay due to catastrophe, fires, strikes, lock-outs, labor conditions, acts of God, unavoidable accident, riot, war (whether declared or undeclared), or by the enactment of any municipal, state or federal ordinance or law or by the issuance of any executive or judicial order or decree, or by any other legally constituted authority or any other causes clearly beyond the control of Contractor.

(c) Contractor shall not be liable (1) for any repairs or alterations, or (2) for damages or delay where caused by defective material or its workmanship or otherwise.

(d) In no event shall Contractor be liable to the Owner for special or consequential damages.

7. (a) Contractor does not make any guaranty or give any warranty covering the equipment, machinery, apparatus, accessories, parts or supplies furnished or used by Contractor, and nothing herein shall in any way make the Contractor liable in the replacement or repair of defective parts and with respect thereto the guaranties and warranties of the manufacturers thereof, if any, must be resorted to by the Owner.

(b) Contractor in no way assumes any responsibility or liability with respect to use, purpose or suitability of material and equipment furnished and shall not be liable for any damages of any character, whether direct or consequential, resulting from use of such materials and equipment

(c) Unless specifically stipulated on the face hereof to the contrary, it is understood and agreed by both the Owner and the Contractor that the Contractor does not agree to find or develop water, nor does he represent, warrant or guarantee the quality, length of service, quantity or kind of water, if any, which may be encountered. Failure to strike or develop water shall, in no way, release the Owner from liability for the full amount of the Contractor's invoices and compliance with all the terms and conditions hereof.

(d) It is understood and agreed that because of the face hereof to the contrary, it is understood and agreed by both drilling, well repairing pump repairing and the like, Contractor, being subject to such conditions, does not make any guarantee as to work performed or results thereof, and all operations are at risk of Owner.

8. The work to be performed and materials and equipment to be furnished by the Contractor is based upon the available information supplied by the Owner as to the underground formations and the conditions that may be encountered, including information supplied by the Owner as to the same without prior approval by the Owner, (ii) be different from those anticipated, then Contractor is authorized, without prior approval by the Owner, (ii) to make the necessary modification to accommodate the work, the contract price accordingly including, but not without limiting the same, changing the diameter of the casing and screen sizes, and pump size and capacity, from those originally specified or contemplated, without thereby effecting any reduction in the price specified for a different size, (2) to increase the amount to be charged to Owner as may result from the Contractor's unexpected and additional expenditure of time and use of equipment, labor and materials to overcome and adapt the performance of the work to the conditions that are actually encountered.

9. Contractor, without any liability hereunder of any kind whatsoever to the Owner, may terminate this contract for any of the following reasons.

(a) If it encounters any granite, quartzite, igneous, Archean or like rock formation.

(b) If at any time it is of the opinion that the project will not, in Contractor's sole opinion, achieve the desired results without unreasonable effort and expense, or is hopeless and further work thereupon useless.

(c) If it is found unreasonably or impracticable in Contractor's sole opinion to proceed with work.

(d) If the Owner unreasonably delays Contractor in the prosecution of the work or is guilty of other substantial breach of this contract or if the work is stopped under an order of any Court or other public authority for a period in excess of thirty days.

(e) If, in the Contractor's sole opinion, the selection of the well site presents obstacles not originally contemplated by the Contractor, or entails difficult as not anticipated by the Contractor, including but not limited to, lack of free access to the job site, interference presented by existing installations at the job site, insufficient space for the Contractor to set up and operate its equipment, poor road access to job site, etc.