Angela M. SHIPKA, as Trustee and
next of Kin of Vladimir Shipka,
deceased, Appellant,

v.

Richard J. HELVIG, et al., Itasca
Memorial Hospital, Respondents.

No. C2-86-1549.

Court of Appeals of Minnesota.

May 5, 1987.

Review Denied June 26, 1987.

Melvin Ogurak, Lee A. Henderson, Ogurak & Henderson, P.A., Minneapolis, for appellant.

Charles B. Bateman, Halverson, Watters, Bye, Downs & Maki, Ltd., Duluth, for respondents.

Robert F. Berger, Trenti Law Firm, Virginia, for Itasca Memorial Hosp.

Heard, considered and decided by NIERENGARTEN, P.J., and PARKER and FOLEY, JJ.

## OPINION

PARKER, Judge.

Plaintiff's decedent, Vladimir Shipka, died of a heart attack. In this wrongful death action, appellant Angela Shipka, as trustee and next of kin, sued Dr. Richard Helvig and North Star Clinic for negligent diagnosis, care and treatment, and Itasca Memorial Hospital for negligent care and treatment. After the jury returned a special verdict for the defendants, Shipka moved for JNOV and a new trial on the issue of damages or, in the alternative, a new trial. The trial court denied her motion, and she appeals. We affirm.

## FACTS

On Friday, October 3, 1986, Vladimir Shipka and his wife, Angela, had returned to their home in Grand Rapids, Minnesota, after an overnight trip to Mackinac Island, a 12-hour drive, according to Angela Shipka. Vladimir had done most of the driving. During the trip he complained of unfamiliar pains that "came and went" down his neck, shoulder and left arm. The pains were absent on Friday, but returned on Saturday.

On Saturday evening Shipka described his pains to his sister, a registered nurse, and she told him to call his doctor to request an electrocardiogram. Shipka called the North Star Clinic and, after learning that his own doctor at the North Star Clinic was out of town, spoke to family practitioner Dr. Richard Helvig.

According to Dr. Helvig, Shipka said he had been driving a long distance; had been having some intermittent pain in his left shoulder, which was not then present; and that he had experienced this pain previously when he had been driving long distances. Helvig said Shipka told him he had no chest pain, but was taking some blood pressure medication and wondered if he should have an electrocardiogram. According to Helvig, they arranged to meet for an EKG the next morning because Shipka was not in discomfort at the time.

The next day, Sunday, October 5, Shipka drove alone to the Itasca Memorial Hospital emergency room to meet Dr. Helvig for the EKG. He was seen first by the emergency room supervisor, who took a history, which includes the symptoms as described by the patient and as observed. She recorded on the outpatient record that Shipka complained of having constant pain in his left shoulder since October 1, 1980; that at times the pain suddenly became very severe; that it radiated down his left arm to his elbow and at times to his wrist and over the left scapula and upper left chest; that it lasted up to ten minutes; and that he had no shortness of breath or nausea associated with the pain. At trial she testified that he looked well, was smiling, referred to an arthritic condition in his shoulder, and was making light of the situation.

Dr. Helvig then examined Shipka and recorded that the symptoms were as described by the emergency room supervisor; that he examined Shipka's heart and found a regular rhythm with no murmurs or extra sounds; and that he examined Shipka's lungs and found them to be clear, with no edema. He testified that he also examined Shipka's neck and shoulders and found tenderness in the left shoulder. Helvig testified that the examination and presenting symptoms suggested that Shipka had a joint problem; that Shipka didn't have the typical symptoms of angina pectoris (heart pain) either in location or quality—he had

no chest pain, feelings of faintness, shortness of breath, or sweatiness, and the pains were of relatively short duration.

Shipka's EKG was read by a hospital doctor who wrote, "Abnormal EKG. Deep T inversion in the first three precordial leads consistent with ischemia, rule out recent damage." Helvig testified that he did not agree entirely with that doctor's impression because "[t]he interpretation of T wave changes is non-specific and needs to be correlated with what the clinical situation is." The outpatient record shows that Helvig read the EKG and wrote, "suggests ischemia" (suppression of blood flow to the heart).

Helvig testified that, because of the conflict between the EKG and the presenting symptoms, he ordered the supervisor to give Shipka a nitroglycerin tablet to see if it had any effect on Shipka's dull shoulder ache; when it didn't, he felt it was more likely a muscle or joint problem.

Helvig diagnosed Shipka's problem as left shoulder pain of questionable cause. He sent Shipka home with instructions to take nitroglycerin tablets for the left shoulder pain to see if it helped, in which case a heart problem would be suggested, and to come into the clinic later in the week.

Later that evening Shipka called the hospital to say that he was coming in—that the pain had changed and was now in his chest. According to the outpatient record and the night supervisor's testimony, Shipka arrived at 12:05 a.m. on October 6, complaining of an hour of rather severe chest pain somewhat relieved by three nitroglycerin tablets. He was escorted to the emergency room by an LPN and prepared for an EKG, when he complained of feeling faint, and his breathing became labored and irregular. A Code Blue (emergency) team was summoned at 12:13, and the following people arrived: Steven Fisher, orderly; Dennis Vohs, L.P.N.; Charlotte Dudley, R.N., and a coronary care nurse and at least three or four other night nurses. Dr. Helvig arrived from home at 12:26.

The record shows that Shipka was attended at all times; that CPR commenced when "Code Blue" was announced at 12:13;

that an endotracheal tube was inserted at 12:19; that medications were begun at 12:20; and that the coronary care nurse began defibrillation efforts at 12:21.

At 1:21 a.m. on October 6, CPR was stopped and Shipka was pronounced dead. Helvig diagnosed Shipka's death as myocardial infarction (heart attack).

Angela Shipka, as trustee and next of kin, sued Helvig and the North Star Clinic for negligent diagnosis, care and treatment, and Itasca Memorial Hospital for negligent care and treatment. During jury selection the trial court granted each of the defendants two peremptory challenges.

Angela Shipka called two expert witnesses to testify against Helvig: Dr. James Axford, a New York family practitioner, and Dr. Kenneth Brown, a Vermont specialist in cardiology and internal medicine. The testimony of these experts, taken together, was that the October 5 electrocardiogram was markedly abnormal, with deep T inversions consistent with or suggestive of ischemia, a life-threatening problem; that Helvig departed from good and accepted standards of care by failing to compare the October 5 EKG to Shipka's previous EKGs; that on the basis of the electrocardiogram and the presenting symptoms Helvig should have diagnosed unstable angina pectoris and hospitalized Shipka; that the risk of developing a heart attack from unstable angina is only about ten percent, with adequate treatment, and the risk of dying is even less; and that Helvig's failure to hospitalize Shipka in the intensive care unit and properly treat him with anti-angina, anti-ischemic medication led directly to Shipka's death.

Helvig also presented two experts: Dr. James Daniel, an Abbot Northwestern cardiologist, and Dr. Douglas Hiza, a Duluth family practitioner. They testified that Shipka's symptoms were atypical of a heart attack because of the type and duration of pain and the absence of associated symptoms like shortness of breath, nausea and excess sweating. Specifically, they testified that the pain of angina pectoris is typically pressure-like pain in the center of the chest, rather than the sharp or stab-

bing pain reported by Shipka in the upper left chest; that it typically lasts two to four minutes rather than five to ten; and that it would never occur for days at a time. They testified that Helvig's diagnosis, care and treatment were reasonable; that it was reasonable for Helvig to give Shipka nitroglycerin in an attempt to distinguish the pain of angina from other pain; that most angina patients are treated on an outpatient basis; and that no one could know whether Shipka would have survived had he been hospitalized on October 5. Helvig's testimony was in agreement.

A long-time friend of Shipka testified that Shipka had a history of arthritis in his neck and shoulders that caused him considerable pain and stiffness over the years and that Shipka tended to minimize his problems rather than complain.

During the trial Angela Shipka objected to the production of the medical report of one of her expert witnesses and to the exclusion of certain testimony as hearsay.

The jury instructions included, over Angela Shipka's objection that it was not applicable to negligent diagnosis, JIG II, 425 G–S, Duty of Doctor, which includes the "honest error in judgment" language: "A doctor is not a guarantor of a cure or a good result from his treatment and he is not responsible for an honest error in judgment in choosing between accepted methods of treatment."

On April 17, 1986, the jury returned a special verdict finding no negligence and no damages. ·

On August 8, 1986, the Minnesota Supreme Court issued its decision in *Ouellette v. Subak*, 391 N.W.2d 810 (Minn. 1986), in which it removed the "honest error in judgment" language from jury instructions in medical malpractice cases "henceforth." On August 15, 1986, Angela Shipka wrote to the trial court, calling its attention to that case. On August 19, apparently before receiving the letter, the trial court denied Angela Shipka's motion for JNOV and a new trial on damages only or, in the alternative, for a new trial. On August 29 the trial court, without com-

ment, specifically denied a new trial sought on the basis of the decision in *Ouellette*.

## ISSUES

1. Did the trial court properly instruct the jury?

2. Did the trial court commit reversible error in granting each of the defendants two peremptory strikes?

3. Did the trial court commit reversible error in excluding testimony about statements the deceased attributed to Dr. Helvig, on the grounds that it was hearsay?

4. Did the trial court commit reversible error by ordering production at trial of appellant's expert's medical report?

5. Was the jury's verdict supported by the evidence?

## DISCUSSION

### I

The parties dispute whether the trial court erred in refusing to grant a new trial on the basis of a supreme court decision issued after the jury announced its verdict. *Ouellette v. Subak*, 391 N.W.2d 810 (Minn. 1986), removed the "honest error in judgment" language from jury instructions in medical negligence cases "henceforth:"

> Upon reflection we now conclude the time has come to hold that in professional malpractice cases the mostly subjective 'honest error in judgment' language is inappropriate in defining the scope of the professional's duty toward those the professional serves. In our view, *henceforth, in a medical negligence case, preferably the jury should be instructed as follows:* A doctor is not negligent simply because his or her efforts prove unsuccessful. The fact a doctor may have chosen a method of treatment that later proves to be unsuccessful is not negligence if the treatment chosen was an accepted treatment on the basis of the information available to the doctor at the time a choice had to be made; a doctor must, however, use reasonable care to obtain the information needed to exercise his or her professional judgment, and an unsuccessful method of treatment cho-

sen because of a failure to use such reasonable care would be negligence.

*Id.* at 816 (emphasis added).

Citing the general rule that judicial decisions are to be applied retroactively, appellant contends that, although judgment had already been ordered in favor of respondents on the date of decision, *Ouellette* applies retroactively to mandate a new trial. Respondents rely on the court's use of the word "henceforth" to argue that *Ouellette* is to be applied prospectively. We conclude that the *Ouellette* court intended a limited retroactive application.

The general rule, cited by appellant, is that "a decision of a court of supreme jurisdiction *overruling* a former decision is retrospective in its operation * * *." *Hoven v. McCarthy Bros. Co.*, 163 Minn. 339, 341, 204 N.W. 29, 30 (1925) (emphasis added); *see also Peterson v. Balach*, 294 Minn. 161, 173, 199 N.W.2d 639, 647 (1972) ("the doctrine of stare decisis restrains us from overruling our previous holdings with retroactive effect.") The *Ouellette* decision does not come within this rule because it is not an overruling decision. As the court explained,

> [p]rofessionals are hired for their judgment and skill. * * * [If a medical malpractice] claim involves a question of professional judgment, a choice of strategies or treatment, there may be a need, as we explained in *Staloch v. Holm*, 100 Minn. 276, 111 N.W. 264 (1907), to caution the trier of fact in applying the standard of care to the professional's conduct. The instruction that a doctor "is not responsible for an honest error in judgment in choosing between accepted methods of treatment," is an attempt to meet this problem, but the instruction, because it tries to set out the *Staloch* rationale in shorthand fashion, tends to be subjective and, perhaps on occasion, misleading.

*Ouellette*, 391 N.W.2d at 815.

■ *Ouellette*, therefore, does not overrule *Staloch*. The supreme court, in its supervisory capacity over the trial courts, is merely amending a JIG instruction to express more accurately a legal principle announced in *Staloch* nearly 80 years earlier. It attempts to express the existing rule of law in a non-prejudicial, non-confusing way by removing language which introduced an element of subjectivity into the duty imposed upon juries. Since it is not a modification of or the discovery of an existing but hitherto unrecognized principle of law, there is no need in consistency or fairness to apply it retroactively to all cases pending.

We believe, however, that the *Ouellette* court intended a limited retroactive application—to all cases tried or submitted to the jury after its release. The court stated that "henceforth * * * the jury should be instructed as follows * * *." *Ouellette*, 391 N.W.2d at 816. In *Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616 (Minn.1984), the supreme court used similar language in announcing new jury instructions, stating that it would apply to "this case and to all cases *decided* hereafter." *Id.* at 623–24 n. 4 (emphasis added). Although *Bilotta* is distinguishable in that it involved a new rule of law (jury instructions in light of a recent overruling case), we find the language instructive. We interpret it to mean that the decision was to apply, not to all cases pending as urged by appellant, but to all cases not yet tried or submitted to the jury. We conclude that the *Ouellette* court intended that same limited retroactive application.

The *Ouellette* decision was issued four months after the jury had been instructed and had rendered its verdict in this case. Therefore, we hold the trial court correctly refused to grant a new trial on the basis of that decision.

Appellant also contends the trial court committed reversible error when it refused to give four of her requested instructions. A trial court has wide discretion in deciding the propriety of a specific instruction. *Kalsbeck v. Westview Clinic, P.A.*, 375 N.W.2d 861, 867 (Minn.Ct.App.1985), *pet. for rev. denied*, (Minn. Dec. 30, 1985). The trial court refused to instruct the jury (1) as additional language to JIG II, that the standard of care for physicians is a national standard; (2) that the hospital was held to a "best possible care" standard, rather

than reasonable care, because of language to that effect in its bylaws; and (3) that a direct cause is a legal cause. We have considered these objections and find them to be without merit.

## II

Appellant contends the trial court committed reversible error when it granted each of the defendants two peremptory challenges. Minn.Stat. § 546.10 (1980) provides, in part:

Each party shall be entitled to two peremptory challenges * * *. The parties to the action shall be deemed two, all plaintiffs being one party, and all defendants being the other party, *except, in case two or more defendants have adverse interests, the court, if satisfied that the due protection of their interests so requires, may allow the defendant or defendants on each side of the adverse interests not to exceed two peremptory challenges.* * * *

*Id.* (emphasis added). In determining whether defendants have adverse interests necessitating due protection, previous courts have looked to whether the defendants have cross-issues between them. *See Cornfeldt v. Tongen,* 262 N.W.2d 684, 705 (Minn.1977); *Fick v. Wolfinger,* 293 Minn. 483, 486, 198 N.W.2d 146, 150 (1972).

The trial court granted Helvig and the Itasca Memorial Hospital two peremptory strikes each because the claims against the doctor arose from the events of October 4 and 5, and the claim against the hospital arose from the events of October 6. We conclude that it is a very close question whether this constitutes "adverse interests."

■ In order to warrant reversal, however, an error must be shown to be prejudicial. "[T]he complaining party [must show] that he has exhausted his peremptory challenges and has suffered material injury from the action of the court, and that as a result thereof one or more objectionable jurors sat on the case, or for some other equally cogent reasons." *Fick,* 283 Minn. at 487, 189 N.W.2d at 150 (quoting 95 A.L.R.2d 957, 962). Appellant has not satisfied this burden. She says only that the makeup of the jury was affected and that two of the jurors who signed the special verdict form to her detriment otherwise would not have been part of the jury. Appellant may be correct in that this produced persuasion difficulty for her, but the speculation inherent in predicting what a jury might otherwise have done does not constitute demonstrated prejudice. We conclude that allowing each of the defendants two peremptory strikes, if error, was not shown to be prejudicial.

## III

■ Appellant contends the trial court erred in excluding, as hearsay, testimony about statements that Vladimir Shipka attributed to Helvig: (1) that Shipka probably had bursitis; (2) that an EKG could wait until the next day; and (3) that the EKG showed stress. First, we note that the substance of these statements was admitted into evidence through cross-examination. We agree with the trial court that these statements were hearsay because they were out-of-court statements offered to prove the truth of the matter asserted. Minn.R.Evid. 801(c). While Helvig's statements, if taken alone, are admissible as admissions against interest, Minn.R.Evid. 801(d)(2)(A), Shipka's statements are hearsay declarations that come within no exception to the hearsay rule.

## IV

Appellant contends the trial court erred in compelling production of her expert witness' medical report after he used it to refresh his memory. Minn.R.Evid. 612 provides:

Except as otherwise provided in criminal proceedings by the rules of criminal procedure, if a witness uses a writing to refresh his memory for the purpose of testifying, either—

(1) while testifying, or

(2) before testifying, if the court in its discretion determines it is necessary in the interests of justice,—

an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and if otherwise admissible to introduce in evidence those portions which relate to the testimony of the witness. * * *

■ Once it is established that a witness has relied on memoranda or notes to refresh his memory prior to testifying, opposing counsel may examine those papers in order to determine whether the witness' testimony is consistent with it. *State v. Grunau*, 273 Minn. 315, 331, 141 N.W.2d 815, 827 (1966).

■ As Helvig's attorney began to cross-examine appellant's expert witness, Dr. Brown, he noticed a notebook in front of him and asked to see it. It contained Dr. Brown's written report that he admittedly reviewed before testifying. In response to a request for production of the report, the court viewed the report in camera. The court then ordered production on the ground that it contradicted Dr. Brown's testimony indicating that the hospital was negligent. We conclude that the trial court handled the matter commendably and agree that the interests of justice required production of the report.

### V

■ Appellant contends the verdict is not supported by the evidence.

A new trial should not be granted unless the verdict is so contrary to the preponderance of the evidence as to imply that the jury failed to consider all the evidence or acted under some mistake, or from some improper motive, bias, feeling or caprice, instead of honestly and dispassionately exercising its judgment.

*Lamb v. Jordan*, 333 N.W.2d 852, 855–56 (Minn.1983) (quoting *LaValle v. Aqualand Pool Co., Inc.*, 257 N.W.2d 324, 328 (Minn. 1977)). We conclude that a new trial is not warranted on this basis. We do express some reservations because the instructions have since been modified and because the trial court awarded each of the defendants two peremptory strikes. However, the case was vigorously tried with expert witnesses on both sides, and the jury gave it thorough deliberation. A review of the record indicates that, while another jury might have decided differently, the evidence in appellant's favor was not so predominate that reasonable minds could not differ.

### DECISION

Affirmed.