**Patrick F. HUNT, Appellant,**

v.

**REGENTS OF the UNIVERSITY OF MINNESOTA, et al., Shelley N. Chou, M.D., Aizik Wolf, M.D., Respondents.**

No. CO–89–186.

Court of Appeals of Minnesota.

Oct. 10, 1989.

Review Granted Dec. 5, 1989.

· Robert J. Sheran, David G. Newhall, Charles J. Lloyd, Ansis V. Viksnins, Lindquist & Vennum, Minneapolis, for Patrick F. Hunt.

David C. Hutchinson, Geraghty, O'Loughlin & Kenney, St. Paul, for Regents of the University of Minnesota, et al.

J. Richard Bland, William M. Hart, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for Shelley N. Chou, M.D.

Jerome C. Briggs, Charles E. Lundberg, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for Aizik Wolf, M.D.

Heard, considered and decided by FOLEY, P.J., and KALITOWSKI and SCHUMACHER, JJ.

## OPINION

FOLEY, Judge.

In this medical malpractice action, a trial jury returned a special verdict finding that respondents Regents of the University of Minnesota, University of Minnesota Hospital, Shelley N. Chou, M.D. and Aizik Wolf, M.D. were not negligent and appellant Patrick F. Hunt sustained no damages. Hunt appeals from an order denying his motion for a new trial. We reverse.

## FACTS

Appellant was born on December 31, 1945. Although diagnosed as having cerebral palsy at about 18 months of age, he became a self-sustaining person and a public accountant in Mankato, Minnesota.

Appellant's general health was good until December 1982 when, at the age of 37, he began to experience pain and tingling in his neck which intermittently ran down into his right arm and hand. An orthopedic surgeon in Mankato performed some diagnostic tests and then referred appellant to Dr. Chou, a neurosurgeon and chairman of the Neurosurgery Department at the University of Minnesota Hospital.

On January 3, 1983, Dr. Chou examined appellant and admitted him to the hospital. The next day, Dr. Chou performed diagnostic tests which indicated a need for surgery. Appellant agreed to undergo a cervical laminectomy (removal of the posterior arch of a vertebra) to relieve pressure on a nerve and his spinal cord.

On January 5, Dr. Chou performed surgery on the back of appellant's neck with the assistance of Dr. Wolf, a first-year neurosurgery resident. There were no complications, and it is undisputed that no negligence occurred during surgery.

After surgery, appellant was taken to the neurosurgical intensive care unit of the hospital. He remained there until shortly after noon on January 6, at which time he was transferred to the neurosurgical sta-

tion. That same day, Dr. Wolf wrote a postoperative order for nursing personnel to "encourage neck exercises and getting up." Dr. Chou apparently approved this order.

Appellant remained in bed from the end of surgery on January 5 until the evening of January 7. At approximately 8 p.m. on January 7, hospital personnel assisted appellant from his bed to a bedside chair. The circumstances and effects of this event constitute the principal basis of appellant's claim that respondents were negligent in their post-operative care and treatment.

Appellant testified that he was placed in a chair without any support for his neck, despite the fact that he had a fever, was heavily medicated, and suffering from extreme pain and body spasms. Shortly after being left unattended in his room, appellant's head slowly slumped forward until his chin rested on his chest. The "call button" was not accessible to appellant while he was seated in the chair and, because he was unable to audibly call for help, he remained in that position for about 10 minutes.

The nurses returned to appellant's room about 30 minutes after they placed him in the chair. Appellant testified that one of the nurses pushed his head into an upright position and that when he was lifted from the chair, he was aware his legs were numb and unable to support him. He told the nurses: "My legs are numb. I have nothing to stand on."

At approximately 11 a.m. the next day, January 8, 1983, appellant's parents visited their son and discovered he was totally paralyzed from the neck down. After his mother notified hospital personnel that her son was paralyzed, appellant underwent emergency exploratory surgery, where it was determined that his quadriplegia could not be reversed. Presently, appellant is still quadriplegic and requires 24–hour care.

The only health care professional with any recollection of events occurring after the nurses sat appellant in the chair was Dr. Dennis Mollman, a neurosurgical resi-

dent. Dr. Mollman drew blood from appellant's foot at 11 p.m. on January 7, although he did not record any entries in the health professional progress notes concerning his blood draw.

Appellant's hospital records contain no health professional progress notes from either nurses or physicians for the period from 4:30 p.m. on January 7 to noon on January 8. The first note in the health professional progress notes on January 8 is by a neurological resident who, after being informed that appellant was paralyzed from the neck down, recorded that appellant was fed by a nurse earlier that morning.

Appellant commenced a lawsuit against respondents in December 1984 alleging medical negligence. On October 8, 1987, a pretrial conference was held. Over appellant's objection, the trial court awarded respondents four peremptory challenges surmising that adverse interests may develop among them. Appellant was allowed only two challenges.

On September 28, 1988, another pretrial conference was held before a different judge. Although it was five years after the incident, discovery was complete, and no cross-claims were filed, the court stated it would follow the prior pretrial ruling on the peremptory challenges. Appellant again raised an objection.

The trial court refused during voir dire to inquire, or permit appellant to inquire, as to any relationship between prospective jurors and respondents' malpractice insurers. It denied appellant's request to ask prospective jurors whether they or any of their relatives are employed by or have any interest in the particular insurance companies interested in the lawsuit. The court held it would be prejudicial to Dr. Chou to allow this inquiry.

Trial began on October 3, 1988. During trial, the court restricted appellant's cross-examination of Dr. Mollman. He was a witness crucial to respondents' defense that appellant's quadriplegia was caused by something other than being left unattended in a chair after surgery. Appellant was prohibited from inquiring into how Dr. Mollman's deposition testimony differed from his trial testimony, and the court ultimately instructed the jury that there was no evidence Dr. Mollman's testimony had changed.

After a six-week trial, the jury returned a special verdict finding that respondents were not negligent in their postoperative care and treatment of appellant, that Dr. Chou did not fail to disclose potential risks and complications of the January 5, 1983 surgery, and that appellant sustained no damages. Although appellant alleged numerous errors, the court denied his motion for a new trial.

## ISSUES

1. Did the trial court abuse its discretion in awarding respondents four peremptory challenges instead of two?

2. Did the trial court abuse its discretion in prohibiting inquiry on voir dire about prospective jurors' relationships with respondents' malpractice insurers?

3. Did the trial court abuse its discretion in restricting appellant's cross-examination of a crucial witness and instructing the jury that there was no evidence of inconsistent testimony?

## ANALYSIS

1. In our role as an error-correcting court, we have determined that there are three discretionary abuses of significant import, the cumulative effect of which compels reversal.

Appellant contends the trial court abused its discretion by awarding respondents four peremptory challenges instead of two. He claims that no additional challenges should have been allowed because respondents did not have adverse interests requiring protection, and this abuse of discretion resulted in an unlawfully constituted jury.

■ Ordinarily, it is within the discretion of the trial court to grant additional peremptory challenges and its determination will not be reversed on appeal except for a clear abuse of discretion. *Electric Service*

Co. v. Lakehead Electric Co., 291 Minn. 22, 26, 189 N.W.2d 489, 492 (1971).

Minn.Stat. § 546.10 (1988) governs the allowance of peremptory challenges at trial.

> Each party shall be entitled to two peremptory challenges, which shall be made alternately beginning with the defendant. The parties to the action shall be deemed two, all plaintiffs being one party, and all defendants being the other party, *except, in case two or more defendants have adverse interests, the court, if satisfied that the due protection of their interests so requires, may allow the defendant or defendants on each side of the adverse interests not to exceed two peremptory challenges.* When the peremptory challenges have been exhausted or declined, the first six of the remaining jurors shall constitute the jury.

*Id.* (emphasis supplied).

*Alholm v. Wilt,* 394 N.W.2d 488 (Minn. 1986), applies in our analysis of Minn.Stat. § 546.10. While *Alholm* dealt with Minn. R.Civ.P. 47.02, it is reasonable to conclude it would apply to Minn.Stat. § 546.10 as well.

In *Alholm,* the Minnesota Supreme Court noted that errors in the jury selection process in that case were "so subversive of the judicial process as to make reversal necessary." *Id.* at 493 (quoting R. Traynor, *The Riddle of Harmless Error* 64 (1970)). The court specifically rejected the contention that an appellant must demonstrate actual prejudice resulting from an error concerning peremptory challenges. *Id.* at 494.

Two reasons were given by the supreme court to support its conclusion that errors involving jury selection and peremptory challenges required reversal as a matter of law and could not be affirmed under a "harmless error" analysis. First, it is impossible for appellants alleging such errors to demonstrate actual prejudice.

> To show actual prejudice, the complaining litigant would be required to discover the unknowable and to reconstruct what might have been and never was * * *.

*Alholm,* 394 N.W.2d at 493 n. 9 (quoting *Kentucky Farm Bureau Mutual Insurance Co. v. Cook,* 590 S.W.2d 875, 877 (Ky.1979)). In *Cook,* the court evidenced its belief that the proper allocation of peremptory challenges between litigants

> is a substantial right which so pervades the process that its erroneous application requires reversal as a matter of law * * *.

*Cook,* 590 S.W.2d at 877 (cited with approval in *Alholm,* 394 N.W.2d at 494).

Second, public policy disfavors invasion of the jury's internal deliberation process. The law looks "with disfavor on attempts to invade the jury's internal process of decision to impeach verdicts except in relatively rare instances." *Alholm,* 394 N.W.2d at 493 n. 9 (quoting *Cook,* 590 S.W.2d at 877).

Whether respondents merit additional peremptory challenges "depends on whether they have 'adverse interests' necessitating 'due protection' within the terms of the statute." *Cornfeldt v. Tongen,* 262 N.W.2d 684, 705 (Minn.1977). The fact that each party wants to escape liability and prefers that the other suffer does not alone mean that the parties have adverse interests. *Id.* (quoting *Fick v. Wolfinger,* 293 Minn. 483, 486, 198 N.W.2d 146, 150 (1972)).

In *Shipka v. Helvig,* 405 N.W.2d 248 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. June 26, 1987), we held that an award of additional peremptory challenges was harmless error in the absence of a showing of prejudice. *Shipka,* however, is distinguishable from the present case. There the trial court awarded the doctor and the hospital each two peremptory challenges because the claims against the parties arose from events occurring on two different dates. This court concluded that "it is a very close question whether this constitutes 'adverse interests.'" *Id.* at 253.

> In determining whether defendants have adverse interests necessitating due protection, previous courts have looked to whether the defendants have cross-issues between them. *See Cornfeldt v. Ton-*

*gen,* 262 N.W.2d 684, 705 (Minn.1977); *Fick v. Wolfinger,* 293 Minn. 483, 486, 198 N.W.2d 146, 150 (1972).

The trial court granted Helvig and the Itasca Memorial Hospital two peremptory strikes each because the claims against the doctor arose from the events of October 4 and 5, and the claim against the hospital arose from the events of October 6.

*Id.* In the present case, appellant's claims concern only the events occurring on one date and involve all respondents who engaged in a common defense. There is no close question here as was presented in *Shipka.*

■ Where no cross-claims are asserted and the defendants engage in a common defense, extra peremptories, over objection, are not authorized under Minn.Stat. § 546.10.

2. Appellant claims that the trial court's refusal to grant his request that the court inquire or permit him to inquire on voir dire about prospective jurors' relationships with respondents' malpractice insurers was an abuse of discretion.

At the second pretrial conference, in response to appellant's request, the trial court stated:

> This court feels that the issue of insurance, I have talked with the attorneys on behalf of the defense, the insurance carriers have indicated that they stand behind the respective parties in this case through their respective counsel. They are not parties in the lawsuit. It would be in this particular instance, I think, highly prejudicial to allow insurance in there. We have doctors and the University and I think that the recovery, whatever it is, would be handled by the respective defendant parties. The request will be denied.

There is no precedent for the ruling by the trial court.

At the post-trial motion hearing, again concerning the question as to whether any jurors had an interest in any of the specific insurance companies involved, appellant challenged the court's refusal to allow inquiry regarding this issue.

THE COURT: I would say as to those specific companies that were involved, but there were insurance questions asked.

MR. SHERAN: Yes, I think one of the jurors indicated that she had a daughter of hers that worked for Donaldson's.

THE COURT: Donaldson Companies.

MR. SHERAN: And we made inquiry in that connection as to what her experiences were and what the related experiences of her daughter were as given to her and that brought into, brought to the attention of that juror at least and to the others and to the extent that they were there, our concern with that aspect of it, but as to particular insurance companies who had the money on the line in this case, nobody I think will claim that even the names of those insurance companies were mentioned to the jurors because they weren't.

■ As a general rule, the trial court has discretion to determine whether jurors should be questioned about their potential relationships with an insurer interested in the case. *McCarthy Well Co. v. St. Peter Creamery, Inc.,* 410 N.W.2d 312, 316 (Minn.1987). Its determination will not be reversed on appeal except for a clear abuse of discretion. We hold that trial court discretion is not without bounds and was exceeded in this case.

Rule 31 of the Code of Rules for the District Courts provides in part:

> In the examination of the jurors by counsel as to their qualifications, *the jurors may be asked collectively whether any of them have any interest as policyholders, stockholders, officers, agents or otherwise in the insurance company or companies interested, but such question shall not be repeated to each individual juror.* If none of the jurors indicate any such interest in the company or companies involved, then no further inquiry shall be permitted with reference thereto.
>
> If any of the jurors manifest an interest in any of the companies involved, then counsel may further inquire of such

juror or jurors as to his or their interest in such company, including any relationship or connection with the local agent of such interested company, to determine whether such interests or relationship disqualifies such juror.

Minn.Code R.Dist.Ct. Part I, Rule 31 (1988) (emphasis added).

■ The general inquiry into whether jurors carry insurance, as was done here, is to ask the obvious. This is 1989, and there are few today who do not carry insurance of some sort. That is not the issue, and such general inquiry does not protect the plaintiff's right. Interest in the *particular* companies involved here, the St. Paul Companies, St. Paul Fire and Marine Insurance Company, Ruminco, Ltd. of Hamilton, Bermuda, or Evanston Insurance Company, is important.

> The rule is now settled that "in order to secure to litigants unbiased and unprejudiced jurors * * * plaintiff's counsel had a right to ascertain whether there was such a relationship between the persons called as jurors and the insurance company, a corporation vitally interested in the result, which would disqualify these persons because by implication they would be biased and prejudiced."

*Viou v. Brooks–Scanlon Lumber Co.*, 99 Minn. 97, 105–06, 108 N.W. 891, 894 (1906).

Questions regarding jurors' connections with insurance companies are routinely allowed during voir dire. It has been long-settled in Minnesota that a plaintiff "is entitled to learn the facts in reference to such insurance, in order to properly and intelligently examine the jurors." *Antletz v. Smith*, 97 Minn. 217, 220, 106 N.W. 517, 518 (1906). *See also McCarthy Well*, 410 N.W.2d 312 (court cited Rule 31 and upheld trial court's examination of jurors concerning their contacts with an insurer that was not a party to the action but was interested in the outcome); *Rosenthal v. Kolars*, 304 Minn. 378, 231 N.W.2d 285 (1975) (plaintiff's collective question of whether any jurors or their close relatives had ever been employed as a claims adjuster for any company that wrote medical malpractice insurance was proper); *Lesewski v. Nielsen*, 254 Minn. 286, 95 N.W.2d 13 (1959) (trial court's question to prospective jurors regarding their connection with a particular insurance company was not prejudicial error).

In *Spoonick v. Backus–Brooks Co.*, 89 Minn. 354, 94 N.W. 1079 (1903), the supreme court held that the trial court acted within its discretion when it allowed the plaintiff to inquire of jurors upon voir dire if they were stockholders, or in any way interested, in a certain insurance company. In explaining the protection deserved by a plaintiff, the supreme court stated:

> If the proposed juror was a stockholder or otherwise interested in such a company, his disqualification would seem to follow as a matter of law. If this be so, it is difficult to see upon what ground the court could refuse to permit counsel to ascertain the facts while impaneling the jury. * * * It is [plaintiff's] right first to learn the facts, and he must do so to exercise intelligently his right to challenge peremptorily. The authorities all go to show that a very insignificant interest in the result of an action, and frequently a very trifling relationship to one of the parties, is significant to disqualify a person from sitting as a juror.

*Id.* at 358–59, 94 N.W. at 1081 (emphasis supplied).

This is a medical malpractice case, grounded in negligence. It is to be treated, and the parties and insurance companies are to be treated, no differently from any others in civil cases. Either the court on its own, or counsel, should have been permitted to inquire about the specific insurance companies with an interest in this case. *Appellant had no gauge by which he could determine either implied or actual bias of prospective jurors.* He was seriously prejudiced.

The reason expressed by the trial court in determining that it would be prejudicial to Dr. Chou to permit inquiry has an invalid base. It is no answer to the request of the plaintiff to inquire of the jury concerning particular insurance companies to say that Dr. Chou would be prejudiced because

of the amount of coverage he carried. The plain fact is that appellant was prejudiced by the court's ruling and it did nothing to correct it. How the particular company is involved or whom it insures or the amount of coverage carried by a party is never explained to the jury unless the carrier is a party at issue, and even then the amount of coverage is not disclosed. The reasons given here by the trial court are at complete variance with the settled rule and practice, in the trial of tort cases in this state.

What has occurred here is that, on the one hand, respondents engaged in a common defense and were erroneously allowed two extra peremptory challenges in violation of Minn.Stat. § 546.10. On the other hand, appellant was denied a legitimate right to inquire about the particular companies interested in this litigation. This was an abuse of discretion and centered on the issue of whether appellant received a fair trial. Selection of the jury is a critical part of the case. This was a serious mistake in the conduct of the proceedings. *See Alholm*, 394 N.W.2d at 494 (granting of new trial affirmed where trial court erred in jury selection process); *Ouellette v. Subak*, 391 N.W.2d 810, 816 (Minn.1986) (remand for new trial affirmed where trial court's mistake was prejudicial).

3. Appellant alleges the trial court abused its discretion in restricting his cross-examination of Dr. Mollman, thus preventing him from showing how the doctor's trial testimony dramatically differed from his deposition testimony.

Dr. Mollman was a witness pivotal to respondents' argument that appellant's quadriplegia was caused by something other than his being left unattended in a chair on January 7, 1983. At a pretrial deposition, Dr. Mollman testified that appellant withdrew his foot from the needle as Dr. Mollman attempted to draw blood. He specifically testified that he had to "have a nurse hold [appellant's] knee down" because "every time I stuck him, he pulled his foot away."

At trial, appellant's expert neurosurgery witness, Dr. Theodore Kurze, testified that the description Dr. Mollman gave in his deposition concerning appellant's withdrawal of his foot from the needle was a reflex action totally consistent with paralysis. Dr. Kurze's opinion was substantiated by the operative report of January 8, 1983 (concerning appellant's second surgery after he was known to have become quadriplegic), which states that "the patient woke up from anesthesia responding to pain by flexion of his left knee and ankle and movement of his left toe."

A few days after Dr. Kurze testified, Dr. Mollman was called as a defense witness and elicited testimony critically different from his deposition testimony. He stated that although initially appellant withdrew his foot, the second time Dr. Mollman attempted to draw blood, appellant made side-to-side motions.

Appellant attempted to impeach Dr. Mollman on cross-examination by inquiring into the change in his testimony. The trial court, however, severely limited this cross-examination and prevented appellant from arguing the differences in testimony to the jury. Additionally, upon respondents' request, the court instructed the jury:

A witness at a deposition is under no obligation to volunteer information or to do anything other than to respond to the questions which are asked.

It further issued the instruction that, as a matter of law, Dr. Mollman's testimony had not changed:

You are instructed that there is no evidence Dr. Mollman's testimony at trial was changed from the testimony he gave at the time of his deposition.

It was on surrebuttal examination by respondents that Dr. Kurze was asked how he knew Dr. Mollman had changed his trial testimony from that given in his deposition. He replied that he was told that by appellant's counsel. Dr. Kurze requested an opportunity to review Dr. Mollman's trial testimony, but his request was ignored.

Q Who told you that he changed his testimony?

A Mr. Newhall.

Q Did you see anywhere in Dr. Mollman's deposition that he was ever

asked one question by Mr. Newhall about the direction in which the leg moved?

A I did not, no.

Q Did Mr. Newhall tell you what Dr. Mollman said in court about the direction this patient's leg moved?

A No.

Q And I suppose until you know what direction the leg moved it's kind of hard to say if it's a triple flexion reflex or anything else?

A Why don't you show me his testimony.

Q You don't know unless you know what direction the leg moved, do you?

A I don't know what he testified to in court. That's all I had.

MR. HUTCHINSON: Nothing further.

MR. BLAND: I don't have anything further.

MR. BRIGGS: Nothing.

Thereafter, respondents obtained a ruling as a matter of law from the trial court that took the credibility issue from the jury concerning Dr. Mollman.

■ We hold that respondents were not entitled to an instruction as a matter of law on a fact issue because of dissatisfaction with Dr. Kurze's response on cross-examination to certain questions and where the credibility of both Drs. Kurze and Mollman were critical in the case. *See Haeger v. Leuthold*, 153 Minn. 544, 547, 191 N.W. 257, 258 (1922) (new trial must be granted where trial court took from the jury a vital issue concerning negligence).

■ Cross-examination of an adverse witness is an inviolate right. *Alford v. United States*, 282 U.S. 687, 691, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931); *Klingbeil v. Truesdell*, 256 Minn. 360, 366, 98 N.W.2d 134, 140 (1959). It is basic to our judicial system and is an essential element of a fair trial. *Alford*, 282 U.S. at 692, 51 S.Ct. at 219.

■ The object of all witness examinations, both direct and cross, is to elicit facts to discover the truth. Cross-examination of a witness should not be restricted so long as it serves that purpose. *Mattfeld v.*

*Nester*, 226 Minn. 106, 126, 32 N.W.2d 291, 305 (1948).

■ Generally, the latitude allowed in cross-examination is largely within the trial court's discretion and will only be reversed on appeal for a clear abuse of discretion. *Murray v. Walter*, 269 N.W.2d 47, 49 (Minn.1978). However, the court's discretionary power should be used with extreme caution since it may tend to influence the jury. *Kloos v. Soo Line Railroad*, 286 Minn. 172, 176, 176 N.W.2d 274, 277 (1970).

■ Despite the broad discretion granted the trial court, we are troubled by the court's limitation of the cross-examination of Dr. Mollman. Counsel traditionally is given considerable leeway in questioning on cross-examination unless the questions are used to harass or are repetitive. *State v. Shamp*, 422 N.W.2d 520, 527 (Minn.Ct. App.1988), *pet. for rev. denied* (Minn. June 10, 1988). Though *Shamp* is a criminal case, what is true in criminal cases is most certainly true in civil cases, especially on crucial issues.

■ The purpose of cross-examination is to test the truthfulness of the statements made by a witness on direct. It may be used to break down the testimony in chief or attack the credibility of the witness. *Wiley v. United States*, 257 F.2d 900, 910 (8th Cir.1958).

The law has long recognized the propriety of a litigant's attempt to elicit facts through cross-examination justifying an inference of partiality or bias of the witness.

*State v. Blasus*, 445 N.W.2d 535, 544 (Minn.1989) (Kelley, J., dissenting); *see also McCormick on Evidence*, ch. 5, § 40 (E. Cleary 3d ed. 1984).

Supportive of the fundamental right of cross-examination is the following statement by Justice Kelley in *Blasus:*

Since the earliest days of statehood, this court has consistently held in both criminal and civil cases that bias, state of mind, and inclinations of witnesses, upon whose testimony in part the issue is to be determined, are not collateral or immate-

rial matters; that cross-examination on the issue of bias or interest is a matter of right; and that its denial or undue circumscription is prejudicial error. *See, e.g., State v. Dee,* 14 Minn. 35, 37 (Gil. 27, 30) (1869); *Alward v. Oakes,* 63 Minn. 190, 193, 65 N.W. 270, 271 (1895); *[State v.] Elijah,* 206 Minn. [619] at 625, 289 N.W. [575] at 579 [1940]. In the latter case we quoted with approval the observation of the Supreme Court of the United States in *Alford v. United States,* 282 U.S. 687, 692 [51 S.Ct. 218, 219, 75 L.Ed. 624] (1931).

> Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. * * * To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial.

*Elijah,* 206 Minn. at 625, 289 N.W. at 579.

Rule 402, Minn.R.Evid., which provides that relevant evidence is admissible at trial, is identical to its federal counterpart, Fed.R.Evid. 402. Under either, credibility evidence is almost always relevant. "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel,* 469 U.S. 45, 52 [105 S.Ct. 465, 469, 83 L.Ed.2d 450] (1984). Although Rule 403, Minn.R. Evid., excludes relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice," nonetheless, the *Alford* rule implicitly circumscribes the discretion of trial courts to limit cross-examination for bias. *Elijah,* 206 Minn. at 625, 289 N.W. at 579.

*Blasus,* 445 N.W.2d at 545 (Kelley, J., dissenting).

In the present case, the trial court prevented appellant from pursuing a line of legitimate questioning regarding credibility.

> The established safeguards of the Anglo–American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.

*Hoffa v. United States,* 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966). This ruling stripped appellant of legitimate argument to the jury on crucial fact issues.

■ The court's ruling was not just one of those evidentiary rulings occurring in a lengthy trial that can be described as harmless error on the theory that no evidence showed an inconsistency. In deciding whether Dr. Mollman's trial testimony and prior statement are inconsistent for impeachment purposes, a broad concept of inconsistency should be applied. A striking contradiction need not be apparent. If the prior statement, taken as a whole, would raise inferences different from those raised by the witness' testimony, the prior statement should be considered sufficiently inconsistent. 11 P. Thompson, Minnesota Practice § 801.05 (1979).

Appellant's pursuit of cross-examination, a fundamental right, was on a critical issue and with a crucial witness. The trial court's ruling, as a matter of law, invaded the province of the jury.

The jury, not the court, is the exclusive judge of the credibility of evidence. *Romanik v. Toro Co.,* 277 N.W.2d 515, 518 (Minn.1979). Conflicting expert testimony must be resolved by the jury. *Id.; see also Krueger v. Knutson,* 261 Minn. 144, 159, 111 N.W.2d 526, 536 (1961) (credibility of medical experts and weight given to their testimony is for the jury). Illustrative of this kind of error is a railroad crossing case where the supreme court granted a new trial after the trial court interfered with a credibility issue.

> The trial court instructed the jury that the train bell was ringing at the time of the accident. It gave this instruction

despite a sharp conflict in testimony—the engineer and brakeman testifying that they rang the bell, and the driver of the car testifying that he heard no bell. We think the trial court was in error in so instructing the jury. *Credibility issues are peculiarly within the province of the jury and trial courts should scrupulously avoid taking sides on such issues. The court's implicit identification with the railroad employees provides our main grounds for reversal.* *Young v. Wlazik,* 262 N.W.2d 300, 310 (Minn.1977), *overruled on other grounds by Perkins v. National Railroad Passenger Corp.,* 289 N.W.2d 462 (Minn.1979) (emphasis supplied).

 Although justice does not require a trial without error, it does demand a trial without errors that prejudice the result. *Rowe v. Goldberg,* 435 N.W.2d 605, 609 (Minn.Ct.App.1989), *pet. for rev. denied* (Minn. April 24, 1989) (Foley, J., dissenting). The cumulative effect of the discretionary abuses discussed here led to the finding of no negligence by the jury and likewise pervaded the balance of the verdict where no damages were awarded.

Respondents' motion to strike portions of appellant's appendix is denied.

## DECISION

The trial court abused its discretion in awarding respondents additional peremptory challenges, in prohibiting inquiry on voir dire about prospective jurors' relationships with particular insurance companies, and in restricting appellant's cross-examination of a crucial witness. Appellant's motion for a new trial should have been granted. We reverse and grant a new trial on all issues, including damages.

Reversed.