# ELECTRIC SERVICE CO. OF DULUTH, INC. v. LAKEHEAD ELECTRIC COMPANY AND OTHERS.

189 N. W. (2d) 489.

July 30, 1971—No. 42712.

*Paul J. Louisell,* for appellant.

*Harold A. Frederick,* for respondents Lakehead Electric and Wesley Harkonen.

*Applequist, Lyons, Nolan, Donovan, Larson & Barnes* and *Charles T. Barnes,* for respondent Reuben Johnson and Sons.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Rogosheske, JJ.

NELSON, JUSTICE.

Appeals by plaintiff, Electric Service Co. of Duluth, Inc., from an order of the St. Louis County District Court entered June 26, 1970, denying plaintiff's motions for judgment against defendants-respondents, Lakehead Electric Company, Wesley Harkonen, and Reuben Johnson and Sons, Inc., on the issue of liability, and new trial on the issue of damages only, or, in the alternative, for a new trial against all defendants on all issues.

Plaintiff, hereinafter referred to as Electric Service, is a Minnesota corporation engaged in the electrical contracting business in Duluth and surrounding areas. Reuben Johnson and Sons, Inc., hereinafter referred to as Reuben Johnson, is a Wisconsin corporation engaged in the general contracting business in the Great Lakes region of Minnesota, Wisconsin, and Michigan. Lakehead Electric Company, hereinafter called Lakehead, is a Minnesota corporation engaged in the electrical contracting business in Duluth and surrounding areas. Wesley Harkonen is president, majority stockholder, and general manager of Lakehead.

On July 10, 1968, Reuben Johnson submitted a bid for a prime contract to the State of Wisconsin for the construction of a steam and electrical distribution center at Wisconsin State University located at Superior. The bids were opened later that same day and disclosed that Reuben Johnson was the low bidder. On July 11, 1968, one of Reuben Johnson's employees telephoned Keith Morse, manager of Electric Service, and asked Morse if Electric Service would be interested in submitting a bid on the subcontract for the electrical work on the project. In response, Morse went to Reuben Johnson's office in Superior the next day to discuss the requirements of the electrical portion of the project with Troy Johnson, Reuben Johnson's owner and general manager. Troy Johnson gave Morse plans and specifications for the project and the latter returned to Duluth where he and another employee of Electric Service analyzed the plans and prepared bid

summary sheets containing a tentative estimate for performance of the electrical work.

A few days later, Morse returned to Reuben Johnson's office and, after discussing the estimate with Troy Johnson, made a verbal offer of $322,500. Johnson asked Morse to reduce his offer by $500, which he did, and Johnson thereupon accepted it and told Morse to submit the offer in writing. Morse drafted a written proposal of the agreement, signed it, and took it to Troy Johnson at his office July 19, 1968. Troy Johnson then signed it in behalf of Reuben Johnson and Sons, Inc.

Morse thereupon left the Reuben Johnson office and placed a large order for materials and equipment for the job with Graybar Electric Company, an electrical distributor in Duluth. He also arranged for a line of credit to be extended to Electric Service for the job from a Duluth bank and another line of credit from a supplier. On July 23, 1968, Reuben Johnson and the State of Wisconsin signed a written contract for the construction of the steam and electrical distribution center at Wisconsin State University.

On July 29, 1968, Morse was notified by Troy Johnson that Electric Service was "unacceptable" to do the electrical work on the steam and electrical distribution center. Troy Johnson called Morse again the next day and asked him to cancel the order for materials which Electric Service had placed. The factor which caused Reuben Johnson to find Electric Service unsuitable for the job was the opinion of Charles Goldsmith, the consulting engineer on the project, who told Reuben Johnson that he thought Electric Service did not have enough past experience or equipment to adequately perform the electrical work.

Wesley Harkonen had made Reuben Johnson an offer for the electrical work on behalf of Lakehead about a week after he had heard Reuben Johnson was the low bidder on the project, but his offer was rejected. However, when Troy Johnson was informed by Goldsmith that Electric Service was unacceptable, he called Harkonen and asked him for a figure on the project.

Johnson was not satisfied with the first figure he received and another was submitted, $320,000, which Johnson accepted and for which he wrote a purchase order contract which was signed by Harkonen July 31, 1968. Lakehead, upon receiving the sub-contract, took over Electric Service's orders for materials which had been placed with Graybar, issuing its purchase order for that material which was already in shipment. On August 2, 1968, Troy Johnson informed Morse that he had given the subcontract on the electrical work to Lakehead. Lakehead subsequently per-formed the electrical work on the project.

Electric Service commenced an action for damages for breach of contract against Reuben Johnson and a second action against Harkonen and Lakehead for wrongful interference with the contract between Electric Service and Reuben Johnson, demand-ing compensatory and punitive damages. The actions were con-solidated for trial and, following a lengthy trial, were submitted to the jury on special interrogatories. The special interrogato-ries submitted in the action against Reuben Johnson asked:

"1.  Did Charles Goldsmith, as a representative of the archi-tect, by any action or conduct on his part cause Reuben Johnson and Sons, Inc., to fail or refuse to perform its agreement of July 19, 1968, with Electric Service Co. of Duluth, Inc.?"

The jury answered "Yes."

"2.  Did defendant Lakehead Electric by any conduct or ac-tion on its part, through its officer Wesley Harkonen, cause Reuben Johnson and Sons, Inc., to fail or refuse to perform its agreement of July 19, 1968, with Electric Service Co.?"

The jury answered "No."

"3.  Did defendant Reuben Johnson and Sons, Inc., fail or refuse to perform its agreement of July 19, 1968, with Electric Service Co. for any reason other than reasons stated in questions No. 1 and No. 2?"

The jury answered "No."

"4. What compensatory damages did Electric Service Co. suffer as a direct cause of defendant Reuben Johnson and Sons, Inc., failure or refusal to perform its agreement of July 19, 1968, with Electric Service Co.?"

The jury answered "None."

The special interrogatories submitted in the action against Lakehead and Wesley Harkonen asked:

"1. Did defendant Lakehead Electric by any action or conduct on its part, through its officer defendant Wesley Harkonen, cause Reuben Johnson and Sons, Inc., to fail or refuse to perform its agreement of July 19, 1968, with Electric Service?"

The jury answered "No." It was instructed that if its answer to that question was "No," it was to answer no further interrogatories.

Based on the jury's answers to the special interrogatories, the trial court ordered judgment for all defendants. These appeals followed.

■ Electric Service contends the defendants should have been given a total of three peremptory challenges to the jury panel, rather than six—three to Reuben Johnson, in the one case, and three to Lakehead and Harkonen, in the other. As we see it, in view of the different theories asserted by plaintiff in the two actions, this ruling was well within the discretion of the court. Furthermore, it is fundamental that a party complaining of a discretionary ruling must demonstrate that such ruling resulted in harm or prejudice to his case. Plaintiff has not done so.

■ After careful review of the evidence, we are satisfied that it sustains the jury's answers to the interrogatories and that the court was thus fully justified in adopting those answers as the basis for its order for judgment in defendants' favor.

In the breach of contract action, the jury's determination that plaintiff suffered no damages is fatal to plaintiff's case. While plaintiff introduced considerable evidence by which it undertook to prove it would have made substantial profit, there was also

evidence to the contrary. We conclude that the jury could thus reasonably find that a company with as little experience, personnel, equipment, and background as plaintiff had would not have been able to earn a profit if it had performed the work required by the subcontract.

The court's adoption of the finding that plaintiff had not proved any damages renders moot several issues plaintiff seeks to raise with respect to the propriety of certain evidentiary rulings. We will, however, give them brief consideration.

The consulting engineer, Goldsmith, was permitted to testify that, on behalf of the architect and the State of Wisconsin, he had informed Troy Johnson that in Goldsmith's judgment plaintiff did not have the experience or equipment required to do the electrical work on the project. The witness said he urged Johnson not to permit plaintiff to do this work. As to this testimony, plaintiff consistently claims that Goldsmith had no power to object to plaintiff's employment to perform the work. Reuben Johnson, on the other hand, contends that the contract between the State of Wisconsin and the architectural firm of which Goldsmith was a member clearly gave that power to the architectural firm; and that Reuben Johnson was therefore excused from performance of the subcontract with plaintiff.

The trial court's theory of plaintiff's breach of contract case was that while a binding agreement existed between Reuben Johnson and Electric Service, the agreement was subject to certain conditions—the award of the prime contract to Reuben Johnson, and the acceptance by Wisconsin State University of Electric Service as the electrical contractor. It appears that the trial court was satisfied that the failure of Goldsmith as an agent of the university to approve Electric Service as a subcontractor was a legal excuse for nonperformance by Reuben Johnson, but that the court nevertheless wanted the jury to determine whether Reuben Johnson refused to perform for that reason or merely because Lakehead would do the work for a lower price, as alleged by Electric Service. The answers to interrogatories 1, 2, and 3

in this action determined that Reuben Johnson's refusal to perform was caused by Goldsmith's conduct alone.

We agree that plaintiff's subcontract was contingent upon its being approved by the State of Wisconsin, the owner of the project, and that Reuben Johnson was therefore exonerated from liability for its refusal to permit plaintiff to perform after Reuben Johnson was informed by Goldsmith, as an agent of the state, that plaintiff was not acceptable. Goldsmith's authority to make such a decision is apparent from the contract between the state and the architectural firm of which he was a member, as that contract requires the architect to exercise general supervision over the construction project and to "endeavor to guard the Owner [the State of Wisconsin] against defects and deficiencies in the work of contractors." Power over the selection of contractors is necessarily implied from that requirement.

Plaintiff also complains of the reception of evidence relative to the general practice in the building trade in Superior, Wisconsin, whereby decisions of this nature were made routinely by the architect. We think it well within the discretion of the trial court to receive that evidence, as well as plaintiff's evidence to the general effect that such a custom did not exist.

■ It is also clear that the trial court properly ordered judgment for the defendants in plaintiff's action for wrongful interference with contract, since the evidence sustains the jury's finding that neither Lakehead nor Harkonen in any way caused Reuben Johnson to fail or refuse to perform its contract with Electric Service. See, Snowden v. Sorensen, 246 Minn. 526, 75 N. W. (2d) 795; Hansen v. Barret (D. Minn.) 186 F. Supp. 527; Sorenson v. Chevrolet Motor Co. 171 Minn. 260, 214 N. W. 754, 84 A. L. R. 35; Continental Research, Inc. v. Cruttenden, Podesta & Miller (D. Minn.) 222 F. Supp. 190; Franhan Distributors, Inc. v. New York World's Fair (2 Cir.) 124 F. (2d) 82. It is clear that plaintiff has failed to establish the essential elements of a case for wrongful interference with contract.

Affirmed.