Irene PERKINS, as Trustee for Surviving Spouse and Next of Kin of Patrick J. Perkins, Deceased, Appellant,

v.

NATIONAL RAILROAD PASSENGER CORPORATION, d.b.a. AMTRAK, et al., Respondents,

Public Service Commission, Department of Public Service, State of Minnesota, Respondent.

No. 47876.

Supreme Court of Minnesota.

Nov. 9, 1979.

Hansen, Dordell & Bradt, Wayne P. Dordell and J. Mark Catron, St. Paul, for appellant.

Rider Bennett, Egan & Arundel, Stuart W. Rider, Jr., and Roger R. Roe, Jr., Minneapolis, for Nat. Railroad Passenger Corp., et al.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., David W. McKenna and John M. Sands, Sp. Asst. Attys. Gen., St. Paul, for Public Service Commission, Dept. of Public Service, State of Minnesota.

YETKA, Justice.

This is an appeal by plaintiff Irene Perkins as trustee for surviving spouse and next of kin of Patrick J. Perkins, deceased, from judgment entered pursuant to a five-sixths verdict in favor of defendants Chicago, Milwaukee, St. Paul and Pacific Railroad Co. (Milwaukee Road), National Railroad Passenger Corp. (AMTRAK), M. H. McClintock (train engineer), and Minnesota Public Service Commission [1] and from the order of the district court denying plaintiff's motion for judgment notwithstanding the verdict or for a new trial. Defendant Public Service Commission (PSC) has filed a notice of review on the issue of sovereign immunity. We reverse and remand for a new trial.

The legal issues raised on this appeal are:

1. Did the trial court err by not declaring that the Belden crossing was extrahazardous as a matter of law?

2. Should the extrahazardous doctrine be overruled?

3. Did the trial court err by not allowing the jury to determine whether the railroad was negligent by not using adequate headlights to warn motorists of its approach?

4. Did the trial court err by not allowing the jury to determine whether the speed of the train was excessive?

5. Did the trial court err by refusing to give an instruction that the PSC was negligent in failing to hold a hearing to determine whether more protection was needed at the Belden crossing after receiving a petition from the Village of Cottage Grove?

6. Is the PSC immune from tort liability because of the doctrine of sovereign immunity?

The accident upon which this action is based took place on March 29, 1974, at the Belden crossing in Cottage Grove, Minnesota. At that crossing, Belden Boulevard intersects the single track main line of the Milwaukee Road at approximately right angles.[2] Belden Boulevard is a blacktop road wide enough for two lanes of traffic in each direction at and near the railroad crossing. The crossing is located in a residential-commercial section of Cottage Grove. About 350 feet east of the railroad crossing, Belden Boulevard intersects Highway No. 61. At that location the highway intersection is controlled by automatic semaphores.

Yellow advance warning signs are located 174 feet west of the crossing on the south side of Belden Boulevard. On both the west and east sides of the crossing, 15 feet from the center line of the track and 5 feet from each curb line of Belden Boulevard, there had been installed electric automatic railroad crossing signals with red alternating flashing lights and a rotating STOP banner (also known as Griswold signals). The flashing lights were dual-faced, i.e., each faced both east and west.

1. The National Railroad Passenger Corporation (AMTRAK) owned and operated AMTRAK passenger train No. 8 on March 29, 1974; defendant M. H. McClintock, a Milwaukee Road employee, was the engineer; the tracks and right-of-way, including the automatic electric signals at the Belden Boulevard crossing, were owned and maintained by defendant Chicago, Milwaukee, St. Paul and Pacific Railroad Company (also known as the Milwaukee Road).

Pursuant to a ruling by the trial court that these three defendants were engaged in a joint enterprise, they will collectively be referred to herein as "defendant Railroads."

2. At trial, the parties and witnesses used "north" and "south" to refer to the direction of the tracks and "east" and "west" to refer to the direction of Belden Boulevard. We will use the same descriptive terms.

The Griswold signals were installed in 1962 pursuant to an order of the Minnesota Railroad and Warehouse Commission (now Public Service Commission). At about the same time, the Commission also issued an operating license authorizing train speeds up to 79 miles per hour at this location. Traffic counts introduced in evidence at trial indicate that in 1962 an average of 2,700 vehicles used the Belden crossing each day. This number had increased to between 12,000 and 14,000 vehicles per day by 1974. From 1962 until the time of the accident involved herein, approximately 35 million vehicles had crossed the Belden crossing, but no automobile-train collisions resulting in either death or personal injuries had occurred. Only two property damage collisions had occurred at the crossing in that 12-year period; one of these involved a tow truck left unattended on the tracks. In 1974 approximately 19 trains crossed Belden Boulevard daily, at speeds between 60 and 70 m. p. h. Because of the proximity of the tracks to Highway 61, traffic during rush hours was often backed up from the stop lights to and over the crossing. The accident involved here occurred during rush hour; there is no evidence that the deceased was familiar with the crossing under rush hour conditions.

Moreover, as a result of commercial development, various commercial and traffic-regulating signs and lights lined Belden Boulevard on both sides of the crossing. In addition, there were entrances, exits, and activity associated with three gasoline service stations near the crossing.

In December 1972, both the Milwaukee Road and the PSC were notified of dangers incident to the Belden crossing by the Minnesota State Patrol. On February 8, 1973, Independent School District No. 833 requested the PSC to lower train speed limits and install crossing gates. The Village of Cottage Grove made a similar request by a letter dated February 13, 1973.

On February 21, 1973, State Representative Michael Sieben wrote to the Milwaukee Road to notify it of "ever increasing volume of traffic" over the Belden crossing. On February 26, 1973, Congressman Albert Quie expressed a similar concern in correspondence to the PSC.

In March 1973, the Milwaukee Road responded to Representative Sieben, acknowledging that it was aware the crossing was being studied by the PSC. Yet, as shown by its interoffice correspondence, the railroad's initial reaction to these complaints was fear that they would "jeopardize our operation. It seems when such requests as this are granted, they have a habit of spreading to other locations."

The PSC responded to the Village of Cottage Grove that a formal petition was necessary. The village complied by a resolution and petition dated March 21, 1973, requesting determination of the need for gates and train speed limits at the crossing. The acting engineer of railway negotiations of the state highway department, by interoffice memorandum to the district engineer, and by letter to Congressman Quie, stated that "[u]pon receipt of a proper petition, the Commission will schedule a public hearing in the community to give all parties an opportunity to be heard." No such hearing was ever held.

The PSC investigated the Belden crossing and reported that the installation of gates at this crossing "could likely be justified." However, the study referring to the Belden crossing also included two other crossings in the Cottage Grove-Newport area; both of these latter crossings were given a higher priority for gates than the Belden crossing.

On August 15, 1973, the engineer of railway negotiations sent a copy of his investigative report to the Milwaukee Road and requested the preparation of a cost estimate for the installation of gates. The Milwaukee Road, in turn, computed its share of the expenditure for gates by September 24, 1973, and included the cost of gates in its 1974 budget on November 15, 1973. However, it did not respond to the PSC until February 5, 1974, when it advised the engineer of railway negotiations of its preliminary estimate of the cost of installation.

Neither the Milwaukee Road nor the PSC had installed gates or provided for interim

safety measures such as reduced train speed before March 29, 1974, the date of the accident. The crossing signals had been checked by a signal maintainer on March 28, 1974, the day before the accident, and checked again after the accident on March 29, 1974, and found to be in good working order on both occasions. As of the date of the accident, no crossing gates had been installed at any single track main line railroad crossing within the seven-county Twin City metropolitan area.

At and just before 7:30 a.m. on March 29, 1974, the weather in the vicinity of the Belden Boulevard crossing was overcast. Although eyewitnesses' descriptions of the weather varied (e.g., cloudy, misty, dark, clear) the evidence established that visibility was good. Eyewitnesses saw the headlight of the train and the train itself when it was approximately one-quarter of a mile north of the crossing.

Train No. 8 approached the Belden crossing from the north traveling south at 68 miles per hour. Its headlight was on, and the engineer began sounding the regular crossing whistle warning at the whistle post located 1,500 feet north of the crossing. Griswold signals were activated when the train was 2,933 feet north of the crossing, warning of the approach of the train by red flashing lights and a rotated STOP disc for approximately 25 seconds before the train reached the crossing. Seven disinterested (non-railroad) eyewitnesses testified about the approach of the train, the whistle signal, the headlight, the crossing signals, the operation of the Perkins' automobile, and the happening of the accident. The testimony of these independent witnesses may be fairly summarized as follows: Three saw the headlight of the engine as it approached the crossing from distances up to one-quarter of a mile away; three did not recall one way or the other seeing the headlight; and one did not see it. Of the same seven eyewitnesses, three heard the train's whistle as it approached the crossing; one was not sure; and three did not know or could not recall. Five of the seven witnesses saw the crossing signals operating in STOP position a substantial length of time before the train reached the crossing; one did not recall; and one said they came on only when the engine was almost at the crossing. This last-mentioned witness also claimed that, although he looked, he saw no train approaching when he was 100 feet, 50 feet, 25 feet, and 10 feet from the crossing; the train missed hitting his vehicle by inches.

The engineer testified that he turned on both the stationary and the oscillating headlights of the engine when the train left St. Paul, but no witness saw the oscillating light on. A photograph of the engine and the car taken right after the accident shows the engine's stationary headlight on but not the oscillating light. The engine may also have had a yellow "flipflop" rotating light located on the top of the engine, but there was no evidence that any such light was on at the time of the accident.

The brakes of the train were in good working condition but were not applied until the engineer realized that Perkins' car was starting up from a stopped position and was proceeding directly into the path of the train. At that moment the engine was about 200 to 300 feet from the crossing, and the application of the train brakes did not appreciably reduce the speed of the train before the collision occurred.

Perkins' car was observed approaching the railroad crossing driving east on Belden Boulevard at a slow speed in heavy traffic. It had stopped 25 to 30 feet west of the crossing in the southerly or right-hand lane of traffic. Just before the accident, George Radke, driving a Volkswagen van, was ahead of the Perkins' car and in the left lane of traffic. Radke started up, drove through the signals with flashing red lights and banner in the STOP position, and narrowly missed being hit by the engine. Because Radke's van was a car length ahead of the Perkins' car, defendants claim Perkins' view of the track was unobstructed, both when he stopped and when he moved over the crossing. Assuming the speed of Perkins' car was 4 miles per hour, the automobile would have traveled 6 feet per second at that speed while the train would

have traveled 100 feet per second. As Perkins' car crossed the tracks, it was struck on the left (driver's) side by the engine of the train. Perkins was killed instantly.

Plaintiff brought this action for wrongful death as trustee on behalf of the surviving spouse and children of decedent Patrick J. Perkins. Defendant Public Service Commission moved for its dismissal as a defendant on the ground, *inter alia,* that it was immune from tort liability because of the state's sovereign immunity. That motion was denied on the ground that Minn. Stat. § 216A.09 (1974) indicated that the state had consented to suit. Trial of the action was had in Ramsey County District Court.

1. We hold in this opinion that the extrahazardous crossing doctrine shall be abandoned in this state. Accordingly, a new trial must be held; however, we do not deem it error for the trial judge to have given instructions on the basis of previously existing precedents. On remand, the judge shall give jury instructions consistent with this opinion.

2. The extrahazardous doctrine has applied in cases involving railroad crossing accidents.[3] Juries have been instructed that compliance by the railroad with statutes or regulations may be evidence of due care, but that minimum statutory safety requirements may prove insufficient at a particular crossing. *See Leisy v. Northern Pacific Railway,* 230 Minn. 61, 40 N.W.2d 626 (1950). In order to make such a finding, however, juries have first been required to find that the crossing is more dangerous than an ordinary crossing; only then would a railroad have been required to take additional precautions to satisfy its duty of due care. Where minimum statutory or regulatory safety standards have been satisfied, and the jury has not found the crossing extrahazardous, the railroad has been relieved from liability. In practical

effect, therefore, the extrahazardous doctrine has imposed an inordinate burden upon plaintiffs.

■ Instructions to juries have used terms such as "extrahazardous," "peculiarly dangerous," or "more dangerous than the ordinary crossing." It is apparent that such instructions have only served to confuse juries.[4] The focus of a jury's inquiry should be whether the railroad exercised due care under all of the circumstances of the case before it. In *Bryant v. Northern Pacific Railway,* 221 Minn. 577, 23 N.W.2d 174 (1946), this court approved a jury instruction that did not require the jury to find a crossing extrahazardous before it could determine the railroad's negligence. There we said simply:

[T]he rule appears well established here that, if there is anything dangerous or unusual about a crossing within the corporate limits of a municipality, or if it be improperly guarded by signals, regardless of statutory requirements, or if obstructions interfere with the view of travelers using the same, and such factors are known to the company, a fact question arises as to the proper speed at which such a crossing may be passed.

*Id.* at 588–89, 23 N.W.2d at 181. We think the procedure used in the *Bryant* case should be followed in instructing the juries in all cases involving railroad crossing accidents. Terms such as "extrahazardous" should be avoided in order to eliminate jury confusion. Previous cases indicating a contrary requirement are expressly overruled.

3. Plaintiff argues that the trial court erred by not instructing the jury that the railroad was required to display reasonably sufficient lights to warn of the train's approach and by not allowing plaintiff's counsel to comment during closing argument on the failure to display more than one light.

---

**3.** The extrahazardous doctrine was first enunciated in *Hollister v. Hines,* 150 Minn. 185, 184 N.W. 856 (1921) and was more recently discussed in *Young v. Wlazik,* 262 N.W.2d 300 (Minn. 1977).

**4.** One indication that the extrahazardous instruction is confusing is the jury's finding that the Public Service Commission was negligent, despite its finding that the crossing was not extrahazardous. The trial court's instructions strongly implied that negligence could not be found unless the crossing was extrahazardous.

Since we have already decided that a new trial must be had, plaintiff shall be allowed in a new trial to submit evidence. and to argue on this issue as an element of the general negligence on the part of the defendant.

4. Plaintiff argues that the jury should have been allowed to determine whether the railroad was negligent in operating its train at a high speed after notice of dangerous conditions without first finding that the crossing was extrahazardous. The issue of excessive speed is also subject to proof in a new trial.

5. Plaintiff argues that the trial court erred by not instructing the jury that the PSC had a duty under Minn.Stat. § 216A.05, subd. 5 (1974), to hold a hearing on the village's petition within 6 months after receiving it.

The statutory sections chiefly at issue here, as they existed in 1974, are as follows:

216A.05 FUNCTIONS AND POWERS

\* \* \* \* \* \*

Subd. 5. *Hearings upon petitions.* The commission shall receive, hear and determine within six months all petitions filed with it in accordance with the procedures established by law and may investigate, hold hearings and make determinations upon its own motion to the same extent, and in every instance, in which it may do so upon petition.

219.383 SAFE OPERATION OF TRAINS OVER STREETS AND HIGHWAYS. Subdivision 1. *Rate of speed for trains fixed by department of public service.* The department of public service on petition of any city council or any railway corporation may fix and determine after a hearing a reasonable rate of speed for the operation of an engine or train on and over any railroad crossing of a public highway or street in such city.

Subd. 2. *Procedure.* The procedure before the department of public service and the right of appeal under this section shall be that provided in Minnesota Statutes 1941, Chapter 216, and acts amendatory thereof.

Subd. 3. *Maximum rate of speed.* Where the department of public service has fixed the rate of speed of an engine or train over a public highway or street crossing in a city as provided in this section, such rate of speed so fixed shall be the lawful maximum rate of speed at which an engine or train can be operated on and over such public highway or street crossing, until changed by subsequent order of the department.

219.39 DANGEROUS CROSSINGS; COMPLAINTS; HEARINGS. Upon written complaint authorized by a majority vote of the members of the council of any city, or by the board of supervisors of any town, or board of county commissioners of any county in this state, or by the commissioner of highways, filed with the department, by the chief executive officer of the city, the chairman of the board of supervisors or the county commissioners, or the commissioner of highways, as the case may be, that any railroad crossing with any street in the city, or town or county road, or state aid road or trunk highway, is dangerous to life and property, and giving the reasons therefor, the department shall proceed to investigate the matters contained in the complaint, giving the complainant and the railroad company an opportunity to be heard, at a time and place to be fixed by the department, after such notice as the department may deem reasonable; provided, that at least one public hearing shall be held in the town or city, in which the crossing is located.

The trial court ruled that section 216A.05, subd. 5 (1974), did not impose strict liability on the PSC for failure to hold a hearing within 6 months. This ruling was based on the court's interpretation of the statute as designed to promote expeditious handling of complaints.

■ We have previously held that statutory provisions defining the time and mode in which public officers shall discharge their duties, and which are designed to ensure the systematic and prompt handling of the public business, are directory and not man-

datory. *See Heller v. Wolner,* 269 N.W.2d 31, 33 (Minn.1978); *Wenger v. Wenger,* 200 Minn. 436, 438, 274 N.W. 517, 518 (1937); *Vogle v. Grace,* 5 Minn. 232 (294) (1861). Minn. Stat. § 216A.05, subd. 5 (1974), is such a statutory provision. We affirm the trial court's reasoning.

■ In addition, we believe that the PSC cannot be liable for decedent's death because it owed no duty to the decedent beyond that duty it owed to the general public to provide safe railroad crossings. On that issue, this case is controlled by our decision in *Hoffert v. Owatonna Inn Towne Motel, Inc.,* 293 Minn. 220, 199 N.W.2d 158 (1972). *See also Cracraft v. City of St. Louis Park,* 279 N.W.2d 801 (Minn. 1979).

6. Because the PSC is not liable in this case, we need not reach the issue whether Minn.Stat. § 216A.09 (1974) constitutes a waiver of sovereign immunity.

The case is therefore remanded for a new trial. The jury should be permitted to compare the negligence of the parties by applying general rules of negligence and without the application of the so-called extrahazardous doctrine.

Reversed and remanded.