**Patrick F. HUNT, Respondent,**

v.

**REGENTS OF the UNIVERSITY OF MINNESOTA, et al., Petitioners, Shelley N. Chou, M.D., Petitioner, Aizik Wolf, M.D., Petitioner, Appellants.**

No. C0–89–186.

Supreme Court of Minnesota.

Aug. 31, 1990.

Rehearing Denied Oct. 17, 1990.

Robert J. Sheran, David F. Newhall, Charles J. Lloyd, Ansis V. Viksnins, Lindquist & Vennum, Minneapolis, for respondent.

David C. Hutchinson, Geraghty, O'Loughlin & Kenney, P.A., St. Paul, for University of Minnesota, et al.

William M. Hart, J. Richard Bland, Meagher & Geer, Minneapolis, for Shelley Chou.

Jerome C. Briggs, Charles E. Lundberg, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for Aizik Wolf.

KEITH, Justice.

Patrick F. Hunt commenced this medical malpractice action and, after a 6–week trial, the jury returned its special verdict of no negligence. The trial court denied Hunt's post-trial motion for a new trial and he appealed. The court of appeals remanded for a new trial, concluding that reversible error occurred as a result of three instances of an abuse of judicial discretion: (1) the allowance to defendants of two additional peremptory challenges, (2) the refusal to permit inquiry of prospective jurors as to their relationship to named insurance companies and (3) and the limitation of cross-examination of and the provision of jury instructions with regard to the testimony of Dr. Dennis Mollman. *Hunt v. Regents of the Univ. of Minnesota*, 446 N.W.2d 400 (Minn.App.1989). Defendants Regents of the University of Minnesota, University of Minnesota Hospitals, Shelley N. Chou, M.D., and Aizik Wolf, M.D., have appealed, claiming that the trial court's actions did not constitute reversible error. Defendant Wolf also separately asserts in the alternative that, even if there was reversible error, the trial court's denial of a new trial as to him should be affirmed. We reverse the court of appeals.

Patrick Hunt was born on December 31, 1945 with athetoid cerebral palsy characterized by abnormal neck movements. In spite of his condition, he became self-sufficient, employed as a public accountant. Until December 1982, his general health was good and he was able to drive an automobile and enjoy recreational activities. By late 1982, however, the abnormal neck movements had produced an arthritis in the cervical area of his spine. Compression of parts of his spinal cord resulted, causing pain in his right shoulder, arm and little and ring fingers.

On January 5, 1983, surgeons from the University of Minnesota Hospitals performed a cervical laminectomy to relieve the pressure. Defendants Chou, chief of neurosurgery at the University, and Wolf, a resident neurosurgeon who had been in the program for 6 months, successfully performed the laminectomy.

On January 6, 1983, Wolf wrote a post-operative order stating, "per patient encourage neck exercises and getting up." Chou, his supervising surgeon, approved the order. On January 7, 1983, at approximately 8:00 p.m., nurses assisted Hunt from his bed to a bedside chair where he sat unattended for approximately 30 minutes. At the time, Hunt was in pain, was

heavily medicated and had asked to be left alone. After about 10 minutes, Hunt's head began to slowly slump forward until his chin rested on his neck. He later testified that he was unable to summon help when his head fell forward and that, when the nurses attempted to get him back to bed, he informed the nursing staff that his legs were numb and that he had nothing to stand on.

At approximately 11:00 p.m. that night, Dr. Dennis Mollman took a blood sample from Hunt's foot because an elevated temperature indicated possible infection. He had difficulty obtaining the sample and had to stick the foot at least three times with the needle. Hunt's foot moved each time. Based on his observations of the foot movements, Mollman later testified that Hunt was not paralyzed at that time. The physician described the movement both in his deposition and at trial. In the deposition, Mollman stated that Hunt "pulled his foot away" and "withdrew his foot." While at trial, he also described a leg extension movement and a side-to-side foot movement.

Also during that same night of January 7–8, nursing personnel performed neurological checks which indicated that Hunt was able to move his limbs; Hunt's expert later questioned the accuracy of the resulting notations made on the neuro flow sheets. Three respiratory therapists treated Hunt for developing pneumonia by waking him, turning him and directing him to cough and deep breathe, a procedure which gave them an opportunity to discover whether he had developed a problem with his extremities; none was noted. Other nurses took his temperature during the night and made no notation of problems.

In the late morning on January 8, Hunt's parents visited and discovered that he was paralyzed. Exploratory surgery was per-

formed immediately, but the precise cause of the injury was not determined. Hunt asserts that his quadriplegia occurred as the result of being moved to and sitting unattended in the chair on the evening of January 7. The defendants claim that he suffered a stroke sometime during the morning of January 8. Hunt remains a quadriplegic, no longer able to care for himself.

1. Defendants first challenge the court of appeals' determination that the trial court committed reversible error when it allowed four peremptory challenges, two to the hospital and one each to Drs. Chou and Wolf. In this regard, they first suggest that the issue of peremptory challenges was not properly preserved for appellate review because Hunt failed to make a timely record of any objection and failed to supplement the record as required by Minn. R.Civ.App.P. 110.03.[1]

The burden of providing a record on appeal rests with Hunt, the party challenging the propriety, in the first instance, of additional peremptory challenges. *See Custom Farm Services v. Collins*, 306 Minn. 571, 572, 238 N.W.2d 608, 609 (1976). Where no complete record is available, we have mandated compliance with Rule 110.-03 to supplement the record to provide for meaningful and effective appellate review. *See Soukup v. City of Sleepy Eye*, 281 Minn. 144, 146–47, 161 N.W.2d 36, 37 (1968); *accord State v. Evans*, 343 N.W.2d 709 (Minn.App.1984). While we reaffirm that requirement, we find sufficient good cause to suspend that rule under the circumstances here. Minn.R.Civ.App.P. 102.

Defendants do not deny that an objection was made, but instead emphasize that a timely record was not made. For appellate purposes, Hunt inserted into a joint appendix an affidavit made by counsel on April

---

1. Minn.R.Civ.App.P. 110.03 provides as follows:
   If no report of all or any part of the proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may, within 15 days after service of the notice of appeals, prepare a statement of the proceedings from the best available means, including his recollection. The statement shall be served on the respondent, who may serve

   objections or proposed amendments within 15 days after service. The statement and any objections or proposed amendments then shall be submitted to the trial court, and the statement as approved by the trial court shall be included in the record. The trial court's approval of the statement shall be filed with the clerk of the appellate courts within 60 days of the filing of the notice of appeal.

29, 1989, stating that an objection to the number of peremptories granted defendants was made at both pretrial conferences. The affidavit supplements the record but does not comply with Rule 110.-03. No service of the affidavit was made on defendants for submission of objections or proposed amendments, nor was the statement submitted to the trial court for approval. Nevertheless, no evidentiary material is here lacking. That four rather than two peremptory challenges were allowed appears in the record. We are persuaded, accordingly, to suspend the requirements of Rule 110.03 to consider the substantive argument regarding the number of peremptory challenges allowed. We do caution counsel that a proper method of preserving the issue is for the objecting party to place the objection on the record at the time made, detailing the reasons supporting the claim that an allowance of additional challenges is inappropriate.

■ The number of peremptory challenges permitted the parties is regulated by Minn.Stat. § 546.10 (1988). By operation of that statute, the trial court may allow up to two additional challenges to multiple defendants if it is persuaded that those defendants have adverse interests and that those interests require "due protection." Appellate courts will examine that exercise of the trial court's discretion to determine whether an abuse thereof has occurred. *Electric Serv. Co. v. Lakehead Electric,* 291 Minn. 22, 26, 189 N.W.2d 489, 492 (1971).

Minn.Stat. § 546.10 (1988) provides no definitional guidance with regard to the phrase "adverse interests." However, earlier decisions of this court indicate that adversity may be established where "cross issues" exist. *See Fick v. Wolfinger,* 293 Minn. 483, 486–87, 198 N.W.2d 146, 149–50 (1972); *Eilola v. Oliver Iron Mining Co.,* 201 Minn. 77, 78, 275 N.W. 408, 408–09 (1937); *Carr v. Davis,* 159 Minn. 485, 491,

199 N.W. 237, 240 (1924). More recently, in *Cornfeldt v. Tongen,* 262 N.W.2d 684, 705 (Minn.1977), in a matter providing substantial procedural distinctions from the instant case, we commented that no "foreseeable" cross issues might arise thereby limiting the aggregate peremptory challenges of the multiple defendants to two.

■ In our view, a determination of adversity does not rest on whether formal legal actions have been brought by multiple defendants against each other. The filing of affirmative defenses by one of multiple defendants against the other would indicate adverse interests. Additionally, the assertion of different theories by a plaintiff against multiple defendants could also be indicative of adverse interests under certain circumstances. *See Electric Serv. Co.,* 291 Minn. at 26, 189 N.W.2d at 492.

In the matter before us, we cannot determine with precision what facts the trial court considered in allowing the two additional peremptory challenges. However, an examination of the pleadings demonstrates that Hunt alleged one count against all defendants for failure to obtain informed consent, one count against all defendants for the destruction or alteration of medical records, one against the hospital and nurses for negligent care and one against the physicians for the negligent performance of the original surgery and for failure to properly monitor postsurgical care. In addition, Hunt's statement of the case, filed on June 22, 1987, claimed that Chou and Wolf were negligent and that University of Minnesota Hospitals had nurses, nursing assistants, therapists, residents, interns, medical staff and other employees, staff or agents who were negligent in their care and treatment of Hunt. These assertions suggest, with some foreseeability, the potential existence of adverse interests at least between the physicians and the hospital with respect to the surgery and postoperative care.[2] There-

---

**2.** The original decision granting extra peremptories was made by Judge Carey on October 8, 1987. Judge Carey removed himself from the case on November 30, 1987. The case was reassigned to Judge Odland, who due to other trial assignments requested that the trial be postponed until October 1988. At a pretrial conference held on September 28, 1988, Judge Odland upheld the number of peremptories granted by Judge Carey. The dissent suggests that Judge

fore, although the question of adversity is in some doubt, we cannot conclude that, under the circumstances of record, the trial court abused its discretion in allowing these multiple defendants additional peremptory challenges.

■ 2. Defendants then argue that the trial court's prohibition of inquiry on voir dire into prospective jurors' relationships with defendants' malpractice insurers did not constitute reversible error. Such an inquiry is addressed in Rule 31, Code of Rules for the District Courts of Minnesota (1988).[3] It is within the broad discretion of the trial court to determine whether such an inquiry is appropriate. *McCarthy Well Co. v. St. Peter Creamery*, 410 N.W.2d 312, 316 (Minn.1987). The exercise of that discretion is, however, guided by the rationale expressed in *Spoonick v. Backus-Brooks Co.*, 89 Minn. 354, 359, 94 N.W. 1079, 1081 (1903):

> In order to secure to litigants unbiased and unprejudiced jurors, we are compelled to hold that plaintiff's counsel had a right to ascertain whether there was such a relationship between the persons called as jurors and the insurance company, a corporation vitally interested in the result, which would disqualify these persons, because, by implication, they would be biased and prejudiced.

On this record, we are compelled to conclude, consistent with the *Spoonick* analysis, that the trial court should have permitted the inquiry and that its refusal to do so constituted an abuse of discretion. It is then necessary to determine whether the abuse constituted reversible error.

■ The general rule is that error without prejudice will not provide a ground for reversal. *See Midway Center Assocs. v. Midway Center, Inc.*, 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975); *Electric Serv. Co.*, 291 Minn. at 26, 189 N.W.2d at 492. Even where a definite connection has been shown between a juror and an interested insurer, a showing of actual prejudice has been required to mandate a new trial. *See State v. Kyles*, 257 N.W.2d 378, 381 (Minn. 1977). The plaintiff urges us to conclude that no such showing is required under the analysis of *Alholm v. Wilt*, 394 N.W.2d 488 (Minn.1986). There, we reasoned that where deviation from promulgated procedural rules governing jury selection prejudices the jury system itself, reversal is necessary as a matter of law. Prejudice to the system was found in the method of juror selection which deprived plaintiff of his use of an extra peremptory challenge, which in turn deprived him of his right "to know the composition of the jury prior to evidence presentation." *Alholm*, 394 N.W.2d at 493–94. That analysis is not applicable to these proceedings.

While Hunt was prohibited from inquiring into the relationship with the defendants' insurers, he did question prospective

---

Odland should have reconsidered Judge Carey's decision because additional discovery which occurred during the interim year would have altered the grounds for granting extra peremptories. See p. 38 (Kelley, J., dissenting). When Judge Carey removed himself from the case, however, he stated in his removal letter, "The file itself is in order for trial, discovery and pretrials have been completed, and discovery has been cut off. All of the work prior to trial has been completed." Thus, the parties' claims and postures were essentially the same on September 28, 1988 as they had been on October 8, 1987. Because any adverse interests would therefore have remained the same, Judge Odland had no reason to reconsider the number of extra peremptories granted by Judge Carey less than one year earlier.

**3.** Rule 31 of the Code of Rules for the District Courts of Minnesota (1988) provides as follows:

> In the examination of jurors by counsel as to their qualifications, the jurors may be asked collectively whether any of them have any interest as policyholders, stockholders, officers, agents or otherwise in the insurance company or companies interested, [i.e., companies not parties, but interested in the defense or outcome of the action,] but such question shall not be repeated to each individual juror. If none of the jurors indicate any such interest in the company or companies involved, then no further inquiry shall be permitted with reference thereto.
>
> If any of the jurors manifest an interest in any of the companies involved, then counsel may further inquire of such juror or jurors as to his or their interest in such company, including any relationship or connection with the local agent of such interested company, to determine whether such interests or relationship disqualifies such juror.

jurors about their places of employment and that of their children and spouses. He was free to inquire as to whether they were stockholders, officers or directors of any company, a question which would elicit the name of specific insurance companies if a relationship did exist. In fact, where one prospective juror was found to have an insurance background, she was questioned at length in the presence of other prospective jurors, thereby bringing the matter of insurance to the fore. Finally, jurors were questioned about their attitude toward the insurance crisis and possible large damage awards. In light of these facts, it cannot be said that Hunt was prevented from ascertaining the composition of the jury prior to evidence presentation and, accordingly, reversal as a matter of law is not required in the absence of a showing of actual prejudice.

3. Defendants' final contention is that there was no reversible error in the trial court's limitation on the cross-examination of Dr. Mollman and its instructions to the jury that no evidence indicated that Mollman changed his testimony at trial from that given in his deposition.

■ At trial, Hunt attempted to impeach Mollman's testimony with regard to foot movements occurring when Mollman attempted to draw blood from Hunt's foot. At trial, Mollman testified that Hunt "move[d] his foot side to side, withdr[e]w it and extend[ed] it away from the needle." In his deposition, Mollman had only mentioned a pulling away and a withdrawal. A withdrawal could be consistent with a triple flection reflex which is a responsive bending up of the foot, knee and hip that can occur in quadriplegics. Any extension movement would be inconsistent with quadriplegia. Hunt attempted to impeach the trial testimony but the trial court sustained the defendants' objection based on improper foundation.

■ To impeach Mollman, Hunt was required to lay a foundation showing that the statements were in fact inconsistent.[4] *State v. Vance,* 254 N.W.2d 353, 358 (Minn. 1977). The inconsistency must be determined from the full testimony, not isolated portions, and the trial court is vested with broad discretion to weigh any claim to determine the possible prejudicial effect. The decision of the trial court is only reversed if it is clearly shown that there was an abuse of its discretion. *See id.*

Upon examination of the record as a whole, it is our view that the statements at trial were not inconsistent with those made during Mollman's deposition, but instead were an amplification. The fact that counsel at his deposition did not ask detailed questions regarding the movements does not make the amplification at trial during cross-examination an "inconsistency" subject to impeachment. Moreover, although the trial court sustained the objection to questioning directed at impeachment, Hunt had ample opportunity to show the jury

---

**4.** The dissent states that "failure of a witness to describe all material facts is grounds for impeachment" and cites *Erickson v. Erickson & Co.,* 212 Minn. 119, 125, 2 N.W.2d 824, 827 (1942). *Erickson* involved the plaintiff's statement to an insurance adjuster, not a deposition. The plaintiff's statement omitted facts that would permit him to recover under workers' compensation. At trial, he added in his testimony those facts that would permit recovery. *Id.* at 122–26, 2 N.W.2d at 826–27. The commission, which judged the weight and credibility of the plaintiff's testimony in light of his pretrial statement and of other witnesses' statements, disbelieved his trial testimony and refused coverage. This court upheld that finding on the basis that a witness could be impeached by contradicting his testimony and that a fact not asserted permits an inference of its nonexistence. *Id.* at 125–27, 2 N.W.2d at 827–28.

A deposition is not equivalent to a detailed statement to an insurer which purports to give all pertinent information. A deposition is taken under the Minnesota Rules of Civil Procedure. Rule 30.03 provides that examination of the witness proceeds as at trial under Rule 43.02, which means the witness is questioned as at trial. He does not need to volunteer information. Counsel for Hunt admitted during an in chambers conference on the cautionary jury instruction that it appeared that the question which would have brought out complete information regarding the foot movement was not asked during the deposition and that until it was, Mollman was not obligated to answer it. T. at 4013. Thus, Mollman's deposition answer was not a failure to describe all material facts and was therefore not grounds for impeachment.

any difference in Mollman's trial testimony from that elicited in his deposition. Not only did his own questioning of Mollman emphasize any differences in testimony, so also did that of the defendants, because they also had him describe in detail what he had observed. Jurors could certainly identify and compare the abbreviated description given by Mollman in his deposition with the detailed one provided at trial to assess Mollman's credibility. Accordingly, we can find no abuse of the trial court's discretion in limiting the questioning designed to impeach this witness.

■ In spite of the ruling by the trial court, Hunt's expert stated on surrebuttal that "I heard that [Mollman] changed his testimony from his deposition * * *." When asked by whom he was told, he replied, "Mr. Newhall [Hunt's counsel]." Shortly after that exchange, during an in chambers discussion regarding jury instructions, defendants' counsel requested a corrective jury instruction to the effect that no evidence demonstrated that Mollman changed his testimony at trial from that given in the deposition. Counsel argued that "[t]hat statement coming from Mr. Newhall through Dr. Kurze is absolutely inappropriate and it's wrong, it's false and to leave it out there in front of the jury without withdrawing it, correcting it, or advising the jury that it's an error is improper * * *." The request for the cautionary instruction was made immediately before the proceedings ended for the day. When the discussion of the request for a cautionary instruction again arose, counsel

for Hunt appeared to agree that the testimony had not changed, but rather had been amplified. The cautionary instruction stated:

[T]here is no evidence Dr. Mollman's testimony at trial was changed from the testimony he gave at the time of his deposition.

A witness at a deposition is under no obligation to volunteer information or to do anything other than to respond to the questions which are asked.

This instruction explained the situation exactly: Mollman's testimony had not changed. He was not obligated to volunteer information or to do anything other than to respond to the questions which were asked. The trial court did not remove the issue of credibility from the jury.[5]

In our view, the corrective or cautionary instruction was not an abuse of the trial court's discretion. *See Mattfeld v. Nester,* 226 Minn. 106, 130, 32 N.W.2d 291, 307 (1948). Where the trial court had already ruled that proper foundation had not been laid to impeach this witness, where counsel for the plaintiff did not attempt to lay further foundation or to specifically identify to the court the points at which Mollman's testimony at trial differed from that during the deposition, a circumvention of the trial court's earlier restrictive rulings was inappropriate and the trial court was within the bounds of its discretion in limiting the effect counsel's statements might have on the outcome of this matter.

Because in our view none of the asserted errors would require a new trial, we re-

---

5. The dissent suggests that by giving such an instruction, the trial court decided that the foot movement was more than a withdrawal. He compares the instruction to one given in *Young v. Wlazik,* 262 N.W.2d 300, 310 (Minn.1977), in which the trial judge instructed the jury "that the train bell was ringing at the time of the accident." See p. 37 (Kelley, J., dissenting). Testimony had sharply conflicted as to whether the bell was or was not ringing, yet the trial judge removed that issue from the jury. Here, testimony showed foot motion consisted either of only a withdrawal or of withdrawal as well as side to side and extension movements. The trial court took no position on the movement. It only stated that no *change* occurred in Mollman's depositional and testimonial statements

and that a witness is only obligated to answer what is asked. The jury was left with sufficient testimony to decide either way.

The dissent implies that witness credibility depends only on impeachment. The very appearance, presence and demeanor of a witness affect credibility; the testimony given by other witnesses also does, as does documentary evidence. Although Mollman was the only health care person to actually remember events of that night, the very fact that others did not and the very fact that Mollman himself was a defendant could affect a jury's decision regarding credibility. The five week trial with extensive documents and records as well as numerous witnesses presented the context within which the jury judged Dr. Mollman's credibility.

verse the decision of the court of appeals to that effect. We need not address the other issues raised on appeal.

Reversed.

YETKA and COYNE, JJ., took no part in the consideration or decision of this case.

KELLEY, Justice (dissenting):

The majority in Parts 1 and 2 of its opinion rules that the trial court's handling of the grant of additional peremptory strikes and the inquiry on voir dire as to liability insurance coverage, although perhaps in error, was within the trial court's discretion and that it could not be said that this discretion was abused in light of the circumstances existing at the time the rulings were made. Although I disagree with the majority as explained later in this dissent, if those were the only two issues before us, I might not have written further. However, I must respectfully dissent and would remand for retrial of all issues because, in my opinion, the trial court's jury instructions, coupled with its restriction of cross-examination by the respondent's attorney of Dr. Mollman, was an abuse of discretion and constituted, by itself, reversible error.

Following a cervical laminectomy surgical procedure on January 5, 1983, respondent Hunt was placed in the neurosurgical intensive care section of the hospital. The following day he was moved to the neurosurgical section. From the time of his surgery until hospital staff removed him from his bed for the first time on the night of January 7, respondent suffered continued, extensive pain and was heavily medicated with drugs to relieve that pain. During that period of time, his temperature was generally elevated and occasionally his body spasmed violently.

On the night of Friday, January 7, at about 8 p.m., unidentified nurses citing "doctor's orders" over respondent's protest, eased respondent out of his bed and into a chair without providing any support for his neck and head. Shortly afterwards the nurses left the room, leaving respondent unattended. Respondent's head even-

tually slumped forward until his chin rested on his chest. He was unable to call for help because the "call button" used to summon help was inaccessible to him in the chair. The nurses returned a short time later, at which time they noticed respondent's head was on his chest. When they pushed it back to an upright position, respondent promptly informed them that he had no feeling in his legs, after which the nurses lifted him back into the bed.

None of the hospital personnel who cared for respondent between mid-Friday afternoon and mid-Saturday afternoon remembers anything about post-operative events preceding the discovery that respondent was indeed quadriplegic. The only health care professional with any recollection of events occurring after the nurses placed Hunt in the chair was a neurosurgical resident, Dr. Dennis Mollman, who drew blood from respondent's foot at about 11 p.m. on January 7. At a pre-trial deposition, Dr. Mollman testified that each time he stuck Hunt's foot with the needle, the patient *withdrew his foot*. Late in the trial, and only shortly before submission of the case to the jury, Dr. Mollman from the witness stand described the movement as including an extension of the foot and a side-to-side movement.

As the trial ultimately unfolded, the defense contended that Pat Hunt's quadriplegia resulted from something other than his being left unattended in the chair by hospital personnel on January 7. Dr. Mollman's trial testimony was critical to the establishment of that defense because it tended to show that when he drew blood from Hunt's foot, he observed movements of the left leg inconsistent with paralysis at that time—a considerable time after Hunt had been returned from the chair to his bed.

At his pre-trial deposition, Dr. Mollman only testified that he had to "have a nurse hold (Pat's) knee down" because "everytime I stuck him, he pulled his foot away." Five days before Dr. Mollman testified at trial, Dr. Theodore Kurze testified that Hunt's withdrawal of his foot, as was described by Dr. Mollman in his deposition,

was a reflex action totally consistent with paralysis. Respondent Hunt contends that the variance in Dr. Mollman's testimony is crucial to his case. Nonetheless, respondent's attorney's attempt to impeach the doctor by cross-examination at trial respecting that difference was essentially denied by the trial judge. In my opinion, the trial court erred when it intervened in respondent's attempt to impeach Dr. Mollman by cross-examination. The ostensible differences in Dr. Mollman's deposition and trial testimony were a proper area for impeachment, and, from the standpoint of the respondent, were critical because Dr. Mollman's trial testimony describing Hunt's reaction to the pricking forms the basis for the defense, and, if believed, destroys the plaintiff's theory which was based upon the testimony Dr. Mollman gave in his deposition some five years earlier. Respondent's contention that Mollman's trial testimony was crucial is augmented by the fact he was the only health care provider who attended to respondent that night who has any recollection of his actions during the crucial time period when Pat Hunt first complained of his paralysis. At his deposition, in response to the question, "Was the knee spasming?" Dr. Mollman answered by describing the "withdrawal motion," but made no reference to any other movement such as the "side-to-side" movement he described at the trial. The failure of a witness to describe all material facts is grounds for impeachment of the witness. 3A J. Wigmore, *Evidence* § 1042 at 1056 (Chadbourn rev. 1970); E. Cleary, *McCormick on Evidence* § 34 at 74–75 (3rd ed. 1984); *see also Erickson v. Erickson & Co.*, 212 Minn. 119, 125, 2 N.W.2d 824, 827 (1942) (plaintiff omitted facts in statement to insurance adjuster which were included in his testimony at trial). Therefore, I conclude it was reversible error to not permit respondent's counsel to continue his cross-

examination along this line for the purposes of showing any disparity which existed and the significance of that disparity.

But, even if one concludes that the trial court's foreclosure of the cross-examination of Dr. Mollman was itself not reversible error, the trial court's amplification of the error, by preventing respondent from having his own expert explain any differences between the deposition and the trial testimony of Dr. Mollman, combined with its instruction to the jury that "you are instructed that there is no evidence Dr. Mollman's testimony at trial was changed from the testimony he gave at the time of the deposition," compounded the error and deprived the jury of its proper function of resolving credibility issues. The jury is the exclusive judge of the credibility of the evidence. *State v. Larson*, 281 N.W.2d 481, 487 (Minn.1979), *cert. denied*, 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Romanik v. Toro Co.*, 277 N.W.2d 515, 518 (Minn.1979); *see also Young v. Wlazik*, 262 N.W.2d 300, 310 (Minn.1977), *overruled on other grounds, Perkins v. Nat'l R.R. Passenger Corp.*, 289 N.W.2d 462, 466 n. 3, 468 (Minn.1979).[1] Reversal should ensue when a trial judge oversteps the bounds by interpreting the evidence in such a manner as to remove factual issues, such as witness credibility, from the jury's consideration. *See Siats v. Western Union Telegraph Co.*, 251 Minn. 412, 418, 88 N.W.2d 199, 204 (1958). The instruction given by the trial court here, in my view, cannot be passed off as harmless error because it was so prejudicial to the respondent. *See, e.g., McCay v. Mitchell*, 62 Tenn.App. 424, 447–48, 463 S.W.2d 710, 721 (1970) (malpractice case where trial court, in essence, "weighed" the testimony and gave a similar instruction relative thereto). *See also State v. Blasus*, 445 N.W.2d 535, 545 (Minn.1989) (Kelley, J., dissenting).[2]

---

**1.** The author of this dissent was the trial judge whose instructions to the jury, in the eyes of this court, seemingly adopted one interpretation of a crucial fact over a competing interpretation. This court in *Wlazik* ruled that by so doing, the trial judge provided the "main grounds for reversal." *Wlazik*, 262 N.W.2d at 310.

**2.** I there noted:

Since the earliest days of statehood, this court has consistently held in both criminal and civil cases that bias, state of mind, and inclinations of witnesses, upon whose testimony in part the issue is to be determined, are not collateral or immaterial matters; that cross-examination on the issue of bias or interest is

Therefore, although I do not completely accept the "cumulative effect of the discretionary abuses" arguments advanced by the court of appeals, I would affirm its decision and remand for a new trial on all issues including (a) a re-examination of whether the defendants are entitled to additional peremptory jury strikes under Minn.Stat. § 546.10 (1988) in *the light of the posture the parties have in the case as of the time of the retrial,* and, as well, (b) a reconsideration of the limitation imposed at trial on an insurance coverage inquiry by respondent's counsel during voir dire.

(a) *Peremptory Jury Strikes*

Minn.Stat. § 546.10 (1988), insofar as applicable, reads:

> Each party shall be entitled to two peremptory challenges, which shall be made alternately beginning with the defendant. The parties to the action shall be deemed two, all plaintiffs being one party, and all defendants being the other party, except, in case two or more defendants have adverse interests, the court, if satisfied that the due protection of their interests so requires, may allow the defendant or defendants on each side of the adverse interests not to exceed two peremptory challenges.

*Id.* Thus, the plain wording of the statute gives the trial court no discretion to award defendants additional peremptory challenges unless it first finds that the defendants have "adverse interests." Clearly, neither judge who considered the issue made any specific finding that there were "adverse interests" among the defendants. However, the first judge who granted the request for additional peremptory strikes must have implicitly concluded that on the state of the record as it then existed, approximately one year before trial and before trial preparation had been completed, there did exist "adverse interests" between the defendant doctors and the hospital. The trial court, to whom respondent's motion to reconsider the matter was addressed a year later, refused to reconsider notwithstanding the passage of time, that

> a matter of right; and that its denial or undue circumscription is prejudicial error.

trial preparation was now complete, and that no cross-claims between defendants had been filed. Therefore, I would hold that on retrial the trial court should re-examine the prior rulings, and rule on the issue in light of the pleadings and discovery as they exist at the time of the retrial, and unless a finding of "adverse interests" between defendants is made, the trial court should deny the request for additional peremptory strikes. Absent a finding of diversity, the trial court had no discretion.

(b) At the trial, the judge refused to question, and prohibited Hunt from questioning, prospective jurors as to whether they, or any of their relatives, were employed by or had any interest in the defendants' malpractice insurance companies because he felt the mention of insurance would be too prejudicial.

Rule 31 of the Code of Rules for the District Courts of Minnesota covers the issue as follows:

> In the examination of the jurors by counsel as to their qualifications, the jurors may be asked collectively whether any of them have any interest as policyholders, stockholders, officers, agents or otherwise in the insurance company or companies interested, [i.e. companies not parties, but interested in the defense or outcome of the action,] but such question shall not be repeated to each individual juror. If none of the jurors indicate any such interest in the company or companies involved, then no further inquiry shall be permitted with reference thereto.
>
> If any of the jurors manifest an interest in any of the companies involved, then counsel may further inquire of such juror or jurors as to his or their interest in such company, including any relationship or connection with the local agent of such interested company, to determine whether such interests or relationship disqualifies such juror.

Rule 31, Code of Rules for the District Courts of Minnesota (1990).

*Blasus,* 445 N.W.2d at 545 (Kelley, J., dissenting).

For almost 90 years, beginning with *Spoonick v. Backus–Brooks Co.*, 89 Minn. 354, 358–59, 94 N.W. 1079, 1081 (1903), up to the present day, *McCarthy Well Co. v. St. Peter Creamery, Inc.*, 389 N.W.2d 514, 519 (Minn.App.1986), *rev'd. in part*, 410 N.W.2d 312 (Minn.1987), we have held that a plaintiff's lawyer has the right in a tort case to explore the existence of any relationship between a defendant and his or her liability insurer. *See Antletz v. Smith*, 97 Minn. 217, 220–21, 106 N.W. 517, 518 (1906); *Viou v. Brooks–Scanlon Lumber Co.*, 99 Minn. 97, 105–06, 108 N.W. 891, 895 (1906). In general it can be stated that Rule 31 codifies the right recognized by the cases cited. The rule permits the jurors to be asked collectively about any relationship with the insurer, and generally there exists no error when the panel as a group has been questioned on the issue on voir dire either by the judge or by counsel. *See* Carpenter, *Discussion of Defendant's Insurance Coverage During Voir Dire: An Analysis of the Current Practice and its Origins*, 14 Wm. Mitchell L.Rev. 45, 48–63 (1988). Here, the trial judge did not permit any inquiry into the matter. Failure to permit any inquiry is an error as a matter of law, and it cannot be dismissed as harmless when no inquiry at all was permitted. *See, e.g., Alholm v. Wilt*, 394 N.W.2d 488, 494 (Minn.1986) (analysis of why similar failure to follow procedural rules relating to peremptory challenge of alternate juror was not harmless error because of literal impossibility to demonstrate prejudice). The discretion Rule 31 grants to the trial court is not whether or not to deny any inquiry into the insurance coverage matters, but only relates to how the questions may be proposed and by whom. Therefore, on retrial the trial court should review the respondent's request to question the jurors relative to connections with the defendants'

liability insurers, but is, of course, free to exercise his or her discretion as to how and by whom the inquiry is made.[3]

For all of the foregoing reasons, I respectfully dissent and would affirm the court of appeals and remand to the trial court for retrial on all issues.

POPOVICH, Chief Justice (dissenting)
I join the dissent of Justice Kelley.

---

**3.** We are not unaware of a school of thought among lawyers that suggests the real purpose of permitting this type of inquiry on voir dire is not so much to identify a juror's possible relationship to a particular named company or its employees or agents, as to generally inform jurors that indeed if the defendant or defendants are held liable, there exist funds to pay the damages awarded. But even should that be true, the fact remains that our cases and Rule 31 gives the right of inquiry as to specific named companies, and at the trial of this case that was completely denied. While it might be argued that the error was harmless and, therefore, insufficient by itself to justify a new trial, under the circumstances of this case upon retrial, plaintiff's counsel should be afforded the right to make some inquiry into the issues.